```
 1        A.   There is a process for submitting change
 2   orders that exists.
 3        Q.   And give me an example just a hypothetical
 4   of a situation where a medical provider like
 5   PrimeCare or Wexford could come to the State and
 6   say, we know we bid this to provide the medical for
 7   the State of West Virginia, but this situation
 8   occurred and we have to submit a change order?
 9        A.   I cannot remember what change orders were
10   submitted.  It would have gone through
11   Administrative Services, I think.  I would have
12   known at the time.  I cannot remember now.  But
13   there were change ordered during my term, yeah.
14        Q.   I'm sure.  And what I'm looking for is
15   just an example of a situation where a contractor,
16   a medical contractor like PrimeCare or Wexford
17   would submit a change order?
18        A.   Honestly, it was not something I would
19   have negotiated, so I just can't recall what
20   situation would have -- at this time I just can't
21   remember what would have initiated a change order.
22        Q.   Can we agree that when Wexford became the
23   medical contractor in 2022, that West Virginia's
24   inmate population was overcrowded?
```

1      A.  Yes.
2      Q.  Can we agree that when Wexford became the
3  medical contractor for the State of West Virginia,
4  West Virginia's jails, prisons and juvenile
5  facilities were understaffed?
6      A.  Yes.
7      Q.  What impact, if any, does overcrowding and
8  understaffing have on a medical provider's ability
9  to carry out services?
10     A.  I don't know if I'm competent to answer
11 that.  I really don't know if I'm competent to
12 answer what ability -- what effect that has on
13 their ability to provide services.  If they are not
14 able to provide the services, they should make that
15 known and our contract monitor should make that
16 known.  So that would be the fail safe for that, I
17 would think.
18     Q.  In providing medical for West Virginia's
19 roughly 30 correctional facilities, how many
20 physicians does Wexford have?
21     A.  I don't know.  I don't know what their
22 numbers -- I don't know what their staffing numbers
23 are and especially now I would have no idea.
24     Q.  Do you know what the numbers were for

1  challenge?
2      A.  Not that I can think of.
3      Q.  Was overcrowding of our correctional
4  facilities in West Virginia a systemic challenge as
5  of January 2018?
6      A.  I need look at the numbers, but they've
7  always been overcrowded.
8      Q.  We can do that.
9          Any other systemic challenges or problems
10 that DCR was facing when you first started?
11     A.  As I sit here, nothing comes to mind.  I'm
12 sure that things were -- I'm sure that things were
13 being brought to me that we were dealing with.
14 Anthony Center comes to mind as something that
15 happened shortly after I got there.  That was a --
16 that was something that had to be dealt with.
17     Q.  And we're going to talk about Anthony
18 Center.
19              (Exhibit No. 1 marked for
20          identification.)
21 BY MR. NEW:
22     Q.  Exhibit 1 it's a November 30, 2017,
23 letter, memo to all correctional employees from
24 Cabinet Secretary Jeff Sandy Re Corrections

```
 1  a similar memo out, correct?
 2       A.   I never sent a memo like this out.
 3       Q.   And that's not really my question.  My
 4  question is were things along these lines bad
 5  enough other than the typical grievance, Employee
 6  Assistance Program, anything else that you felt
 7  like something major had to be done to address
 8  these?
 9       A.   Well, and maybe it's just different
10  styles.  I wouldn't send a memo out to 5000 people
11  if I had 20 or 30 bad apples.  So I'm just saying
12  that it's always a problem -- if that conduct is
13  going on, it's always a problem.  Would that
14  occasion me to send a memo out to the field,
15  probably not.  It would occasion me to dig down and
16  get the individual bad actors.
17       Q.   Let's talking about some other systemic
18  problems within West Virginia's corrections.
19  Overcrowding, it was bad when you got there in
20  January of '18, correct?
21       A.   Correct.
22       Q.   Did it improve any before you left?
23       A.   Sadly the only time it improved a little
24  was at the beginning of COVID.  And then towards
```

```
 1   the end of COVID, it was bad because we couldn't
 2   move people.  So did it improve by the time I left,
 3   no.  When I left it was probably worse.
 4        Q.  Understaffing at West Virginia's
 5   correctional facilities, jails, prisons, juvenile
 6   facilities, did it get better in the
 7   four-and-a-half years you were Commissioner?
 8        A.  It got better and then it got worse and it
 9   continued to get worse.
10        Q.  Again, those trends that Chief of Staff
11   Douglas talked to us about where the recruiting,
12   the retention, the 2 plus 2 plus 2 plus things like
13   that get you down to about 600 or thereabouts in
14   mid 2019, COVID occurs and some other things and by
15   the time that you leave, you've got about a
16   thousand employment vacancies in your agency,
17   correct?
18        A.  I need to look at the numbers to make sure
19   but I don't have any reason to think that that's
20   not right.
21        Q.  It got better a little bit and then got
22   worse I believe is your testimony, correct?
23        A.  Yes.
24        Q.  One thing we haven't talked about, you
```

```
 1  administration prior to Governor Justice being
 2  elected, but when you all start to do the
 3  consolidation and you're starting from the DOC side
 4  to look over at the regional jails and you're
 5  looking over at the juvenile facilities and now all
 6  of a sudden these are under the Commissioner of
 7  DCR, did you ask the question how did we get here?
 8  How did we get to 200 million dollars of deferred
 9  maintenance?
10       A.   I'm sure that everybody asks that question
11  and the answer was we depend on the money that's
12  allotted to us for what can be done.
13       Q.   And what was the money being allotted?
14       A.   I would have to go back.  Every year there
15  is a certain amount that is allotted for
16  maintenance.  But it doesn't -- it doesn't touch
17  what the overarching bill is.  And I would -- I
18  don't have those figures in front of me and I can't
19  remember.  I just know we didn't get what we
20  needed.
21       Q.   Chief of Staff Douglas testified that the
22  annual allocation for maintenance was 2.25 million?
23       A.   Yeah.
24       Q.   At -- and so let's just round that down to
```

```
 1  Commissioner DOC/DCR, it went from bad to worse in
 2  terms of deferred maintenance, did it not?
 3       A.  Yes.
 4       Q.  It went from about 190 or 200 million to
 5  277 million, correct?
 6       A.  Yes.
 7       Q.  And did you hear Chief of Staff Douglas
 8  testify that recently there was like a 17 million
 9  dollar allocation in additional to the 2.25, did
10  you hear his testimony on that?
11       A.  If I did, I don't remember.  Was that an
12  allocation after I left?
13       Q.  Yes, I believe it was an allocation after
14  you left.
15       A.  I don't remember.
16       Q.  But even with something like 17 million,
17  and I understood Chief of Staff Douglas to say that
18  higher ed, secondary schools and Corrections were
19  supposed to share in 200 million although he didn't
20  know the breakdown of that?
21       A.  I do remember seeing that in the news.
22       Q.  Even if Corrections got all of the 200
23  million and the 17, there would still need to be
24  approximately sixty million spent on deferred
```

```
 1   see if the prisons were full at that time.
 2        Q.   Okay.
 3             So if there is an inmate convicted of a
 4   felony at the Southern Regional Jail, he or she
 5   needs to go to Mount Olive or some other prison,
 6   correct?
 7        A.   Correct.
 8        Q.   And if the prisons are full, there is
 9   nowhere to take that inmate, correct?
10        A.   Hypothetically that would be true, if
11   base -- based on their classification as to where
12   they could go, there could not be a -- it's
13   conceivable there would not be a place and that
14   person has to wait.
15             And that's why those programs that are
16   getting people out of prisons are so critical.
17        Q.   And would you agree with me that if
18   prisons are overcrowded, it's going to make the
19   maintenance situation worse?
20        A.   Yes.
21        Q.   And that's just kind of common sense,
22   isn't it, that if there is a cell that's designed
23   for one person and it has two or three then
24   necessarily the plumbing, the beds, all of the
```

```
 1              Did I go to -- did I have a meeting by
 2   myself with somebody from the Governor's Office?
 3   No.
 4        Q.   No.  And I'm not asking about an
 5   individual meeting that you had with anyone.  I am
 6   talking about a group meeting where those concerns
 7   were raised with either members of the Legislature
 8   and/or members of either the Governor or the
 9   Governor's staff and staffing, maintenance,
10   crowding was talked about?
11        A.   Well, there may have been general meetings
12   and Brian Abraham may have been there with the
13   Secretary.  I can't tell you that that is
14   specifically what that meeting was about.  Those
15   issues came up.  What normally would come up is
16   what I told you before, we would write a proposal.
17   We would say, can we have locality pay.  Here is
18   what we want to do.  Here are some options.  So
19   that's how it would be presented.  And then I -- I
20   know the Secretary had meetings with the Finance
21   Committee and I was not part of those.
22        Q.   I asked Chief of Staff Douglas the same
23   question.  Where did there seem to be pushback, was
24   it in the legislature or the Governor's Office or
```

```
 1         A.  Yes.
 2         Q.  -- that you submitted that went nowhere?
 3         A.  I -- the Secretary's attorney and I
 4   drafted a proposed locality bill.  I don't remember
 5   for what session that was, but we drafted a bill
 6   and we asked for it in another separate proposal.
 7   We had different ways of trying to do it.  One was
 8   do it the way they do it in the Eastern -- you
 9   know, do it by locality.
10              And then at another time I wanted to try
11   doing it by facility so that the Commissioner could
12   designate at any given time this facility is in
13   crisis, whether it's Huttonsville or somewhere else
14   that's sitting in a place that nobody wants to
15   work.  That -- we wrote a bill to that effect.  I
16   know it went somewhere, but nothing happened with
17   it.
18              That might have been -- that might have
19   been the last thing submitted before I left.  But I
20   knew there were -- you know, there are always
21   options that they're playing with for locality pay.
22         Q.  Maintenance, I asked Chief of Staff
23   Douglas this question, State of West Virginia
24   doesn't get $277 millions in deferred maintenance
```

```
 1  overnight, does it?
 2       A.  No.
 3       Q.  That's been a problem at least a decade in
 4  the making, would you agree with that?
 5       A.  Yes.
 6       Q.  The overcrowding situation, that doesn't
 7  happen overnight, does it?
 8       A.  No.
 9       Q.  That problem has been at least a decade in
10  the making, correct?
11       A.  Yes.
12       Q.  And the understaffing of West Virginia's
13  jails, prisons and juvenile facilities, that
14  understaffing issue doesn't happen just overnight,
15  does it?
16       A.  No, but I don't think -- I wouldn't -- I
17  would say that that's been more fluid than the
18  other two problems we've talked.
19       Q.  I know that that's been more fluid.  If
20  you just look at the Annual Report from FY '19, we
21  see the fluidity just within that one fiscal year?
22       A.  Right.
23       Q.  It was as low as I think 610 on June 30th
24  of 2019.  I've seen Brad Douglas quoted as saying
```

```
 1  Reinvestment was 2013.
 2       Q.   '13?
 3       A.   -- so.
 4       Q.   Right.
 5            So we're now a decade into the enactment
 6  of the Justice Reinvestment Act, correct?
 7       A.   Correct.
 8       Q.   And yet there are still portions of it
 9  that are not funded?
10       A.   So I -- I would have to say, I don't know
11  that they are not funded at all, but they are not
12  fully funded.  I just know that it's not as robust
13  as it could be.
14       Q.   And do you agree with Chief of Staff Brad
15  Douglas that approximately 266 million needs spent
16  on the deferred maintenance and approximately 50 to
17  60 million spent on the staffing for the jails,
18  prisons and juvenile facilities in the State of
19  West Virginia?
20       A.   Yes.
21       Q.   And that expenditure of some 310, 320
22  million dollars wouldn't that go a long way to
23  correcting the things that so frustrated you as the
24  Commissioner of DCR for four-and-a-half years?
```

```
 1          A.  Yes.
 2          Q.  So I don't think it would take a better
 3   person in the seat, all due respect, ma'am, you
 4   said a little bit earlier.  I think you could have
 5   done a whole lot with 310 or 320 million dollars,
 6   don't you agree?
 7          A.  I think anybody could have in that seat.
 8          Q.  What else besides the deferred maintenance
 9   and the staffing needs an influx of capital?
10          A.  Well, I think the -- you know, the influx
11   with the staffing will allow program development.
12   You know, right now you have program people
13   standing security posts.  Now, that's more of a
14   prison problem than a jail issue, but -- and the
15   same with a lot of re-entry and programing.  We had
16   started and had such high hopes for the jail side
17   of things, but security has to be the first
18   priority and -- so I think -- I think you can see a
19   lot, you know, you could expand on a lot of things
20   if you could take care of those underlying.
21          Q.  So downstream from security on things like
22   staffing, conditions with maintenance, things like
23   education, drug counseling, all of those things
24   that people like yourself aspire to and with
```

```
 1        A.  I do not.  I know it's over 200 million,
 2   isn't it?  I don't know.
 3        Q.  Hoppy Kercheval Tweeted just today that
 4   Governor Justice proudly announced a budget surplus
 5   of 1.8 billion dollars.
 6        A.  I guess that is over 300 million.
 7        Q.  Do you know why with the a budget surplus
 8   of 1.8 billion dollars the State of West Virginia
 9   is not spending this 310 to 320 million dollars on
10   corrections that's so badly needed and was when you
11   were the Commissioner?
12            MR. MURRAY:  Objection.
13            THE WITNESS:  No.
14   BY MR. NEW:
15        Q.  The spirit is willing but the flesh is
16   weak, you ever heard that?
17        A.  I certainly have.
18        Q.  Turn over to page 12624 and page 9 of 26
19   of the Lesson Plan.
20        A.  Okay.
21        Q.  As far back as 1946, the State of
22   West Virginia found the county's jails to be in
23   anachronisms and totally unfit for human
24   habitation.  Study went on to recommend that the
```

1  county's jails be consolidated into regional jails
2  and adequate numbers of appropriately trained
3  staff.
4          And then we see over there in the small
5  print the West Virginia Regional Jail and Prison
6  Authority was established by legislative action in
7  1985.  So it only took 39 years, 39 years for the
8  State of West Virginia to come up with a regional
9  jail system, correct?
10      A.  That's what it looks like from this.
11      Q.  And then from 1985 if you turn over here
12  and look at the order of opening from '85 it look
13  took another 20?
14      A.  What?  I'm sorry.
15      Q.  Page 11 of 26.
16      A.  I see it.  All right.
17      Q.  It took 20 years for West Virginia to open
18  all of the regional jails that it needed, correct?
19      A.  Correct.
20      Q.  So from 1946 when it was first recommended
21  to June of 2005 by my calculation 59 years it took
22  the State of West Virginia to get around to opening
23  regional jails to make uninhabitable, humanly
24  uninhabitable jails in counties no longer a thing.

```
 1              So West Virginia has known for a long time
 2   that it needs to spend money to house and care for
 3   inmates, correct?
 4        A.   Correct.
 5        Q.   And, in fact, if you look over at the
 6   lesson plan page 16 of 26, it's telling people in
 7   this training litigation can be daunting.  The
 8   authority will spend a great deal of time and
 9   energy defending a suit.  Inmates generally file
10   two types of lawsuits against jails.  Suits for
11   monitory damages and suits for declaratory or
12   injunctive relief.
13              And declaratory or injunctive relief
14   specifically mentions in this training
15   overcrowding, correct?
16        A.   Yes, I see it.
17        Q.   And it specifically lists lack of medical
18   treatment, correct?
19        A.   Yeah.
20        Q.   And then there on page 17, 18, and 19
21   lists some ways to try to deal with those
22   liabilities posed for monitory damage, lawsuits and
23   declaratory or injunctive relief lawsuits, correct?
24        A.   Yes.
```