**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION**

| | | |
|---|---|---|
| THOMAS SHEPPHEARD, | ) | |
| TYLER RANDALL, and | ) | |
| ADAM PERRY, next friend and guardian of | ) | |
| Minor child J.P., on their own behalf | ) | |
| and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _5:23-cv-00530_____ |
| | ) | |
| JAMES C. JUSTICE JR., his official capacity | ) | |
| as Governor of the State of West Virginia, and | ) | |
| MARK SORSAIA, in his official capacity | ) | |
| as the Cabinet Secretary of the West Virginia | ) | |
| Department of Homeland Security, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COME NOW, Plaintiffs Thomas Sheppheard; Tyler Randall; and J.R., a Minor (hereinafter sometimes collectively, "Plaintiffs") by the undersigned counsel, and for their Complaint for Declaratory and Injunctive Relief state as follows:

## I.     JURISDICTION AND VENUE

1.     This is a civil action for declaratory and injunctive relief arising under the Eighth and Fourteenth Amendments of the Constitution of the United States and under the Civil Rights Act, 42 U.S.C. § 1983.

2.     This action is brought on behalf of currently incarcerated inmates housed in state prison facilities, jail facilities, and juvenile centers throughout West Virginia. These facilities are administered by the West Virginia Division of Corrections and Rehabilitation (hereinafter

"WVDOCR"). Specifically, plaintiffs seek to ensure that prisons, jails, and juvenile centers in West Virginia promptly alleviate the pervasive and unconstitutional conditions of overcrowding, understaffing, and deferred maintenance at all of the facilities. These conditions are a violation of the Eighth and Fourteenth Amendments of the United States Constitution, and evidence the State's deliberate indifference to plaintiffs' health and safety as a result of the conditions of confinement in its correctional facilities.

3.      Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65.

4.      Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Venue is proper because some of the above-named Defendants reside within the Southern District of West Virginia, Beckley Division, and because the incidents giving rise to this Complaint occurred within the Southern District of West Virginia, Beckley Division.

## II.      **<u>PARTIES</u>**

7.       Plaintiff Thomas Sheppheard, (hereinafter "Plaintiff Sheppheard") was at all times relevant hereto an inmate incarcerated at Mt. Olive Correctional Complex (hereinafter "MOCC") in Fayette County, West Virginia.

8.      Plaintiff Tyler Randall, (hereinafter "Plaintiff Randall") was at all times relevant hereto an inmate incarcerated at Southwestern Regional Jail (hereinafter "Southwestern") in Logan County, West Virginia.

9.      Plaintiff J.P., by and through Adam Perry his next friend and guardian (hereinafter "Plaintiff J.P.") was at all times relevant hereto an inmate incarcerated at Donald R. Kuhn Juvenile Center (hereinafter "Kuhn") in Boone County, West Virginia.

10.     Defendant James C. Justice Jr. (hereinafter "Governor Justice") is the duly elected Governor of the State of West Virginia and was at all times relevant hereto acting as Governor and under color of law as the Governor of the State of West Virginia.

11.     Governor Justice is responsible for submitting a proposed budget for each fiscal year to the legislature for consideration pursuant to *W. Va. Const. art. VI, § 51*, as well as overseeing and carrying out various executive functions including, *inter alia*, corrections.

12.     The Legislature of West Virginia is empowered to appropriate the funds pursuant to *W. Va. Const. art. X, § 3*, including, *inter alia*, West Virginia's corrections systems.

13.     After the budget bill has been finally acted upon by both houses, supplementary appropriation bills may be considered and passed. *W. Va. Const. art. VI, § 51*

14.     Governor Justice, who upon information and belief resides in Greenbrier and/ or Kanawha County, West Virginia, is sued in his official capacity.

15.     Defendant Mark Sorsaia (hereinafter "Cabinet Secretary Sorsaia") was at all times relevant hereto the Cabinet Secretary of the West Virginia Department of Homeland Security (hereinafter the "WVDHS") and was at all times relevant hereto acting within the scope of his employment and under color of law as the Cabinet Secretary of the WVDHS.

16.     As Cabinet Secretary of the WVDHS, Cabinet Secretary Sorsaia is charged with providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation.

17.     Cabinet Secretary Sorsaia, who upon information and belief resides in Putnam County, West Virginia, is sued in his official capacity.

18.     William K. Marshall, III (hereinafter "Commissioner Marshall"), was appointed by Defendant Justice as Commissioner of the WVDCR on January 19, 2023, and was at all times relevant hereto an employee of the WVDCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the Commissioner of the WVDCR in Defendant Justice's administration.

19.     Defendant Justice's WVDCR is vested with executive authority and responsibility for the administration, operation, and control of all WVDCR facilities and employees of WVDCR facilities.  These duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDCR.  See W. Va. Code § 15A-3-4; W. Va. Code § 15A-3-12.

20.     The State of West Virginia is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in any West Virginia correctional facility.

21.     The State of West Virginia is similarly charged with maintaining and operating its correctional facilities in a manner that meets the minimal civilized measure of life's necessities, by providing, inter alia, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste or sewage, rats, insects, and other contaminants for all inmates housed therein.

22.     Likewise, the State of West Virginia is tasked by law with ensuring that all correctional facilities (prisons, jails, and juvenile facilities) are free from the conditions of

overcrowding, understaffing, and are properly maintained. It has failed in this regard for over a decade. These facilities are: Central Regional Jail, Denmar Correctional Center, Eastern Regional Jail, Huttonsville Correctional Center, Lakin Correctional Center, McDowell Co. Correctional Center, Mount Olive Correctional Complex, North Central Regional Jail, Northern Regional Jail, Ohio County Correctional center, Potomac Highlands Regional Jail, Pruntytown Correctional Center, St. Mary's Correctional Center, Salem Correctional Center, South Central Regional Jail, Southern Regional Jail, Southwestern Regional Jail, Tygart Valley Regional Jail, Western Regional Jail, Anthony Correctional Center, Charleston Correctional Center, Beckley Correctional Center, Parkersburg Correctional Center, J.M. Chick Buckbee Juvenile Center, Donald R. Kuhn Juvenile Center, Gene Spadaro Juvenile Center, Lorrie Yeager Juvenile Center, Kenneth "Honey" Rubenstein Juvenile Center, Ronald Mulholland Juvenile Center, Robert L. Shell Juvenile Center, Sam Perdue Juvenile Center, Tiger Morton Juvenile Center, and Vicki Douglas Juvenile Center.

23.     Plaintiffs demand a bench hearing as soon as possible on all causes of action and requests for relief asserted herein.

### III.     STATEMENT OF FACTS

24.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

#### Unconstitutional Conditions of Confinement

25.     Under the Eighth and Fourteenth Amendments to the United States Constitution, correctional facilities and their staff have a duty to provide inmates with humane conditions of confinement, including, but not limited to, adequate food, clean water, clothing, shelter, sanitation, and medical care.  See *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *Bell v. Wolfish*,

441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1282-84 (S.D. W.Va. 1981).

26.     Likewise, correctional facilities and their staff are not permitted to act with deliberate indifference towards the health and safety of inmates.  See *Farmer v. Brennan*, 511 U.S. 825, 832 (1994);  *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016).

27.     Inmates also have a constitutional right to be reasonably protected from the constant threat of violence and sexual assault while incarcerated.  See *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973); *U.S. v. Bailey*, 444 U.S. 394, 423, 100 S. Ct. 624, 641 (1980).

28.     Despite these constitutional and statutory requirements, Defendants have subjected inmates housed at all the states correctional facilities and other such facilities throughout the State of West Virginia, including Plaintiffs, to inhumane living conditions, deprived them of basic human necessities, and acted with deliberate indifference towards the health and safety of inmates.

29.     Jail overcrowding that causes inmates "to endure genuine privations and hardship over an extended period of time" may give rise to violations of the Eighth and Fourteenth Amendments.  See *Dawson*, 527 F. Supp. at 1294-97 (quoting *Wolfish*, 441 U.S. at 542).

30.     Brad Douglas has worked in West Virginia's correctional system for a quarter century. he currently serves as Chief of Staff of WVDCR. Overcrowding, understaffing, and deferred maintenance all have an impact on safety. (Deposition of Brad Douglas taken June 12, 2023 ("Douglas Depo."), p. 126.) Portions of the deposition are attached hereto as Exhibit 1 and fully incorporated herein.

31.     Betsy Jividen served as Commissioner of WVDOCR from January 2018 to July 2022. In 2022, the inmate population was overcrowded and the facilities were understaffed.

(Deposition of Betsy Jividen taken June 30, 2023 ("Jividen Depo."), pp. 33-34.) The deposition is attached hereto as Exhibit 2 and fully incorporated herein.

32.     Betsy Jividen and Brad Douglas testified that the overcrowding has been at least a decade in the making. (Jividen Depo., pp. 169-170; Douglas Depo., pp. 136). Likewise, former WVDHS Secretary Jeff Sandy testified regarding that understaffing has been an issue for decades. (Deposition of Jeff Sandy taken on July 25, 2023 ("Sandy Depo"), pp. 38).

**Pervasive Understaffing, Overcrowding, and Overdue Maintenance; Availability of Funding; and, Long-Standing History of Delays**

**Understaffing**

33.      On August 11, 2022, Governor Justice issued Executive Order 5-22 finding that: "A state of Emergency exists in West Virginia as it pertains to the staffing levels of our juvenile and adult detention and correctional facilities." The Order is attached hereto as Exhibit 4 and fully incorporated herein.

34.     Governor Justice recognized that "any shortage of correctional officers limits the ability to properly supervise the State's incarcerated individuals" and lack of proper supervision may present a danger to the incarcerated individuals and others. (Exhibit 4.)

35.     Three hundred National Guard members were inserted into in the jails and prisons to help with the severe understaffing in the late summer of 2022.[1]

36.     Based upon information and belief, in August 2022, the Potomac Highlands Regional Jail in Hampshire County has a vacancy rate for correctional officers (hereinafter "CO"

---

[1] https://wvmetronews.com/2023/07/09/excellent-meetings-could-lead-to-proposal-to-address-worker-vacancy-rate-in-states-jails-and-prisons/ (accessed July 10, 2023).

or "CO's") of 64% and the Vicki V. Douglas Juvenile Center in Berkeley County has a vacancy rate of 61%.[2]

37.     Based upon information and belief, in March 2023 more than one thousand job vacancies existed in prisons statewide and eight facilities had vacancy rates exceeding 40%.

38.     Based upon information and belief, in July 2023, only 74 Correctional Officers were employed at Mount Olive State Prison, a prison that typically employs more than 200.[3] The staffing level was less than several months previously when the vacancy rate was approximately 50 percent.[4]

39.      Senator Ryan Weld from Brooke County, West Virginia stated that "it's vital that something be done [regarding the understaffing]."[5] Senator Weld also noted that "[i]t's an area of the state in which we haven't paid our due diligence to."[6]

40.     A state of emergency caused by understaffing for the correctional system previously was issued on December 29, 2017.[7]

41.     A Legislative Oversight Committee report from October 2017 showed the state's ten regional jails all had more inmates than they were designed to hold and have more than three hundred staffing vacancies combined. The West Virginia National Guard was used to help staff the facilities.[8]

---

[2] https://governor.wv.gov/News/press-releases/2022/Pages/Following-legislative-inaction-on-locality-pay-for-correctional-officers-Governor-Justice-declares-State-of-Emergency.aspx (accessed July 10, 2023).
[3] https://www.wvva.com/2023/07/05/correctional-officers-mount-olive-crisis-point/ (accessed, July 10, 2023).
[4] *Id.*
[5] https://wvmetronews.com/2023/07/09/excellent-meetings-could-lead-to-proposal-to-address-worker-vacancy-rate-in-states-jails-and-prisons/ (accessed July 10, 2023).
[6] *Id.*
[7] https://www.wtap.com/content/news/WV-Governors-order-allows-use-of-National-Guard-to-staff-regional-jails.html (accessed July 17, 2023).
[8] *Id.*

42.     Based upon information and belief, the Executive Order stated that excessive amounts of overtime are not conducive to safe working practices and environments.[9]

43.     Based upon information and belief, West Virginia lags behind competitively in terms of correctional officer pay (Exhibit 1, Douglas Depo., p. 53.)

44.     Correctional officers in West Virginia earn approximately Thirty-Two Thousand Dollars per year, while those in the surrounding states of Maryland and Virginia earn Forty or Forty-Four Thousand Dollars per year. (Exhibit 1, Douglas Depo., p. 51.)

45.     This pay rate remained the same since July 2018 when a $6,000 pay increase was enacted in addition to $2,000 from the 5 percent pay raise bill passed earlier for all state employees. The bill brings the starting salary of corrections officers from $24,000 to $32,000 over three years.[10]

46.     At that time, Governor Justice recognized correctional officers are grossly underpaid and Jeff Sandy, Defendant Sorsaia's predecessor, stated that "For every one correctional officer we hired, two individuals were quitting."[11]

47.     The current circumstances of overtime, utilizing the National Guard, and, having non-security personnel working at some of the security posts inside the jails is not sustainable (Exhibit 1, Douglas Depo., pp. 49-50.)

48.     Between August 2022 and June 2023, approximately Seventeen to Nineteen Million Dollars was spent on salaries for the National Guard. (Exhibit 1, Douglas Depo., p. 71.)

49.     Based upon information and belief, the low pay and high workload cause a high turnover rate in correctional officers. (Exhibit 1, Douglas Depo., p. 51.)

---

[9] *Id.*

[10] https://www.corrections1.com/corrections-jobs-careers/articles/wva-governor-signs-co-pay-raise-bill-oc17lVmUs97lVeRN/ (accessed July 17, 2023.)

[11] *Id.*

50.     Based upon information and belief, from July 2019 through July 2022, understaffing in West Virginia's facilities worsened. (Exhibit 2, Jividen Depo., p. 55.)

51.     The correctional officer shortage in the regional jails affects the security of the jails as the facilities depend on staff and security staff to operate them safely. (Exhibit 1, Douglas Depo., pp. 55-56.)

52.     Shortage of staff or overworked staff would have an impact on the safety of the facility. (Exhibit 1, Douglas Depo., p. 56.)

53.     Based upon information and belief, the 2023 correctional officer shortage is the worst in the past thirty years. (Exhibit 1, Douglas Depo., p. 83.)

54.     Despite the ongoing recognition of a severe understaffing problem within West Virginia's prison, jail, and juvenile center facilities, five years later, the executive and legislative branches refuse to come to an agreement regarding any method to address the problem; financial incentives are needed to alleviate the unconstitutional conditions that arise out of the deliberate indifference to plaintiffs' health and safety as a result of the conditions of confinement in that facility.[12]

**<u>Overcrowding</u>**

55.     Based upon the West Virginia Division of Corrections and Rehabilitation Fiscal Year Annual Reports for 2019, 2020, 2021, and 2022, statistics and charts show an increase in population among all correctional facilities in comparison to prior years.

56.     Based upon information and belief, between 2000 and 2009 West Virginia's prison population more than doubled, the highest growth rate of any state in the nation. (Exhibit 1, Douglas Depo., p. 15.)

---

[12] *Id.*

57.     Based upon information and belief, the State of West Virginia was aware of the rapidly increasing population of prison inmates, some of whom were housed in regional jails awaiting space in prison, as early as 2011. (Exhibit 1, Douglas Depo., pp. 20 and 21.)

58.     Based upon information and belief, from January 2018 through July 2022, overcrowding in West Virginia's facilities worsened. (Exhibit 2, Jividen Depo., pp. 54-55.)

59.     Overcrowding makes a facility less safe, secure, and humane than it could be. (Exhibit 1, Douglas Depo., pp. 136-137.)

60.     West Virginia facilities have always been overcrowded. (Exhibit 2, Jividen Depo., p. 47.)

61.      Overcrowding results in having two to three inmates in a cell and inmates sleeping in the day room of the facility. (Exhibit 1, Douglas Depo., p. 141.)

62.     Overcrowding in facilities makes the maintenance situation worse. (Exhibit 2, Jividen Depo., p. 87.)

**Deferred Maintenance**

63.     Based upon information and belief, as of April 2022, West Virginia's correctional facilities were in serious need of maintenance that is only getting worse and the WVDOCR talked to the Legislature, the Department of Homeland Security, the Governor's office, and everybody they could talk to over the last few years about the deferred maintenance list. (Exhibit 1, Douglas Depo., pp. 25, 31, and 33.)

64.     The deferred maintenance list is a list of every project and maintenance needed in every prison, jail, and juvenile facility that does not have allocated funding. Deferred maintenance is maintenance that needs to be done and is not getting done due mostly to the lack of funding. (Exhibit 1, Douglas Depo., pp. 33 and 38.)

65.     Based upon information and belief, from January 2018 through July 2022, the deferred maintenance went from approximately Two Hundred Million to Two Hundred Seventy-Seven Million. (Exhibit 2, Jividen Depo., p. 60; Exhibit 3, Sandy Depo, p. 91).

66.     Based upon information and belief, every year a certain amount of money is allotted for maintenance but "it doesn't touch what the overarching bill is." (Exhibit 2, Jividen Depo., p. 58.)

67.     Every year Two Million Dollars for deferred maintenance is allocated for the prisons; Two Hundred and Fifty Thousand Dollars is allocated for juvenile centers; and no specific allocation is made for the jails because they are subject to a special revenue system. (Exhibit 1, Douglas Depo., p. 34.)

68.     Occasionally, specific allocations for specific projects occasionally are made. (Exhibit 1, Douglas Depo., p. 34.)

69.     The jails are funded through several funding streams.  The largest funding stream is the operational fund that comes in from the per diem from the counties. Other funding streams include revenue from things like commissary, inmate telephones and other such sources. (Exhibit 1, Douglas Depo., p. 34.)

70.     Additional funding for maintenance of the jails in the approximate amount of Seventeen Million Dollars became available in 2022 from bond reserve fund that became available since the bonds were paid off. (Exhibit 1, Douglas Depo., pp. 34-35.)

71.     As of April 2022, the cost of the deferred maintenance for all of West Virginia correctional facilities was more than Two Hundred Seventy-Seven Million Dollars. (Exhibit 1, Douglas Depo., p. 36.)

72.     The cost of the deferred maintenance that was believed to be the most critical in 2022 was approximately Sixty Million Dollars. (Exhibit 1, Douglas Depo., pp. 40 and 43.)

73.     Twenty-Seven Million of the Sixty Million Dollars is needed for door locking control systems and doors and locks in the jails only and some of the prisons and juvenile centers also need these items. (Exhibit 1, Douglas Depo., pp. 44-46.)

74.     A state of disrepair of doors, locks, and door locking control systems can present a risk of harm to inmates as inmates need to be prevented from being able to access other inmates during lockdowns or at night when an inmate is sleeping. (Exhibit 1, Douglas Depo., p. 46.)

75.     The list of the most critical deferred maintenance was provided to the chain of command, including Defendant Sorsaia's predecessor Jeff Sandy, and the legislature, specifically the Oversight Committee. (Exhibit 1, Douglas Depo., pp. 42-43.) Further, Sandy testified that every year during his tenure he appeared before the House and Senate Finance and reported what was needed for deferred maintenance. He also testified that every legislative session, he had meetings with the budget office and provided them with reports on all their needs to which Defendant Justice would submit a budget for. (Exhibit 3, Sandy Depo, pp. 28, 30-31).

76.     Based upon information and belief, sufficient money is not being allocated to keep up with the deferred maintenance in the facilities. (Exhibit 1, Douglas Depo., p. 38.)

**Availability of Funding**

77.     According to West Virginia's recently retired Secretary of WVDHS and WVDCR Chief of Staff, meetings with legislators, representatives from the Governor's office, of the Legislature, and State budget office officials have occurred wherein these individuals were informed that using part of the money from the budget surplus would greatly improve a lot of the

issues with West Virginia's jails. (Exhibit 1, Douglas Depo., p. 77; Exhibit 3, Sandy Depo., p. 30-31.)

78.     Likewise, these government officials would be presented with written proposals with options as to how to correct the overcrowding, understaffing, and deferred maintenance problems within the facilities. (Exhibit 2, Jividen Depo., p. 167; Exhibit 3, Sandy Depo., p. 103-105).

79.     Incredibly, the overcrowding, understaffing, and deferred maintenance issues with the correctional facilities have been developing for over a decade. (Exhibit 2, Jividen Depo., pp. 169-171; Exhibit 3, Sandy Depo., p. 28-29).

80.     Based upon information and belief, the WVDOCR needs the proper money and funding to be able to operate jails safely. (Exhibit 1, Douglas Depo., p. 49.)

81.     ***WVDOCR Chief of Staff testified, if West Virginia spent Sixty Million on correctional officers and Two Hundred Fifty Million on maintenance, a total of Three Hundred Ten Million, a lot of the issues facing West Virginia's jails would be greatly improved***. (Exhibit 1, Douglas Depo., pp. 69-70.)

82.     ***Former WVDOCR Commissioner Jividen testified, "approximately Three Hundred and Twenty Million Dollars would go a long way to correct the overcrowding, understaffing, and deferred maintenance***." (Exhibit 2, Jividen Depo., pp. 175-176.)

83.     The State of West Virginia is not lacking in funds to address the unconstitutional conditions at the facilities.

84.     West Virginia ended the 2023 fiscal year with a $1.8 billion dollar surplus according to Governor Justice, "shattering the all-time record for biggest single-year revenue surplus in state history for the second straight year in a row."  (June 30, 2023, Press Release from

the Office of the Governor, which is attached hereto as Exhibit 5 and fully incorporated herein and Exhibit 1, Douglas Depo., p. 76.)

85.     Approximately $454 million of the surplus remains unappropriated after appropriating $1,165,478,000 of the surplus, none of which was designated to correct the unconstitutional conditions at the state's correctional facilities. (Exhibit 5.)

86.     Upon information and belief, Defendant Justice is only planning on spending $100 million on deferred maintenance, leaving over $100 million in deferred maintenance unaddressed. (Exhibit 3, Sandy depo., pp. 103, 105.)

87.     Defendant Justice and others in state government, the executive or legislative branches, appear to be deliberately indifferent to the deplorable conditions in West Virginia's correctional facilities. In fact, Defendant Justice plans "to work with the Legislature to take what's left unappropriated and continue to make wise investments in what we know will bring us more goodness, like infrastructure, federal matches, and tourism, because the more we tell the world about West Virginia, the more people will want to live, work, and raise their families here." (Exhibit 5.) Defendant Justice and our legislature have yet to mention to the public a detailed plan for tackling $277 million on deferred maintenance.

**Long-Standing History of Delays**

88.     Based upon information and belief, as far back as 1946, the West Virginia Supreme Court found the county's jails to be anachronisms and totally unfit for human habitation and a recommendation was made that the county jails be consolidated into regional jails and adequate numbers of appropriately trained staff be utilized. (Exhibit 2, Jividen Depo., pp. 179-180.)

89.     The West Virginia Regional Jail and Prison Authority was established by legislative action in 1985, taking thirty-nine years for the State of West Virginia to come up with a regional jail system. (Exhibit 2, Jividen Depo., p. 180.)

90.      An additional twenty years passed before all of the regional jails were opened. (Exhibit 2, Jividen Depo., p. 180.)[13]

91.     Therefore, a total of fifty-nine years passed before the State of West Virginia opened regional jails only for them in two decades to turn into, humanly uninhabitable regional jails instead of county jails. See also, Exhibit 2, Jividen Depo. PP 180-181.

92.     In 1983, the Honorable Arthur M. Recht issued a seventy-five page Memorandum of Opinion, Findings of Fact, Conclusions of Law, and Order regarding the West Virginia Penitentiary at Moundsville (WVP) in which it detailed the numerous deficiencies that when considered in their totality rendered the conditions of confinement at WVP unconstitutional. *Crain v. Bordenkircher*, 176 W. Va. 338, 341, 342 S.E.2d 422 (1986). This case is attached hereto as Exhibit 6 and fully incorporated herein.

93.     In February 1995, twelve years later, the new State penitentiary, the Mount Olive Correctional Complex was completed and the prisoners were beginning to be transferred from Moundsville. See, *Crain v. Bordenkircher*, 193 W.Va. 362, 362, 456 S.E.2d 206 (1995).

94.     Based upon information and belief and given the history in the past century, the State of West Virginia would permit unconstitutional conditions at its correctional facilities to continue for extended periods of time, unless specific deadlines are imposed by this Court issuing an order.

**B.      <u>Class A-Current Prison Inmates</u>**

---

[13] This information was gleaned from a 2010 Correctional Officer training module.

95.      Class A includes all currently incarcerated individuals who are inmates housed at MOCC and other prison facilities in West Virginia.

96.      Class A is so numerous that joinder of all members is impracticable.

97.      Members of Class A are fluid, as new individual members are incarcerated at MOCC and other prison facilities, and many members are subsequently transferred to another jail or prison facility.

98.      There are questions of law or fact common to the class.

99.      Class A common questions of fact include whether inmates at MOCC and other prison facilities are or have been exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violate the minimal standards of decency required to pass Constitutional muster.

100.      Common questions of law applicable to Class A include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

101.      The claims of the named Plaintiff are typical of the claims of the class as a whole.

102.      Plaintiff has been subjected to the same constitutional violations as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class members.

103.      The named Plaintiff will fairly and adequately represent and advance the interests of the class.

104.      By filing this action, the named Plaintiff has displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions. By seeking

to remedy the violations of their Constitutional rights, the named Plaintiff will also be advancing and proving the claims and rights of absent class members.

105.     There are no antagonistic interests between Plaintiff and the absent members of the class, and the relief sought by the named Plaintiffs will benefit the class generally.

106.     The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

107.     Counsel for the putative class are knowledgeable about the conditions of confinement in all of West Virginia's correctional facilities, the constitutional rights of inmates, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation. See, also, *Rose et al. v. Jividen, et al*, 5:22-cv-00405.

108.     Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

### i.     Thomas Sheppheard, Class A Representative

109.      Plaintiff Sheppheard was incarcerated at MOCC on or about May 1, 2023.

110.     Plaintiff Sheppheard, along with all the other inmates, are subject to overcrowded facilities, resulting in conditions that were unsafe, unsanitary, and did not meet the requirements set out by law.

111.     Plaintiff Sheppheard, along with all other inmates, are subjected to facilities that were not properly staffed, resulting in unsafe conditions for all inmates in the jails resulting in conditions that were unsafe, unsanitary, and did not meet the requirements set out by law.

112.     Plaintiff Sheppheard, along with all other inmates, are subject to correctional facilities that require millions of dollars of maintenance, resulting in facilities that are unsafe, unsanitary, and did not meet the requirements set out by law.

113.      Plaintiff Sheppheard has been given inadequate portions of food at MOCC.

114.     Plaintiff Sheppheard has only had access to showers with hot water, which resulted in blisters on his back.

115.     Plaintiff Sheppheard does not get regular access to new toothbrushes and toothpaste.

116.     Plaintiff Sheppheard does not have access to a law library at MOCC.

117.     Plaintiff Sheppheard does not have recreational time at MOCC.

**C.     Class B- Current Jail Inmates**

118.     Class B includes all currently incarcerated individuals who are inmates housed at Southwestern and other jail facilities.

119.      Class B is so numerous that joinder of all members is impracticable.

120.      Members of Class B are fluid, as new individual members are incarcerated at Southwestern and other jail facilities daily, and many members are subsequently transferred to another jail or prison facility.

121.     There are questions of law or fact common to the class.

122.      Class B common questions of fact include whether inmates at Southwestern and other jail facilities are or have been exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violate the minimal standards of decency required to pass Constitutional muster.

123.    Common questions of law applicable to Class B include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

124.    The claims of the named Plaintiff are typical of the claims of the class as a whole.

125.    Plaintiff has been subjected to the same constitutional violations as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class members.

126.    The named Plaintiff will fairly and adequately represent and advance the interests of the class.

127.    By filing this action, the named Plaintiff has displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions. By seeking to remedy the violations of their Constitutional rights, the named Plaintiff will also be advancing and proving the claims and rights of absent class members.

128.    There are no antagonistic interests between Plaintiff and the absent members of the class, and the relief sought by the named Plaintiffs will benefit the class generally.

129.    The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

130.    Counsel for the putative class are knowledgeable about the conditions of confinement in Southwestern and other jail facilities, the constitutional rights of inmates, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation.

131.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

### ii.    Tyler Randall, Class B Representative

132.     Plaintiff Randall was incarcerated at Southwestern on or about April 15, 2022, and is currently incarcerated there.

133.     Plaintiff Randall, along with all the other inmates, are subject to overcrowded facilities, resulting in conditions that were unsafe, unsanitary, and did not meet the requirements set out by law.

134.    Plaintiff Randall, along with all other inmates, are subjected to facilities that were not properly staffed, resulting in unsafe conditions for all inmates in the jails resulting in conditions that were unsafe, unsanitary, and did not meet the requirements set out by law.

135.    Plaintiff Randall, along with all other inmates, are subject to jail facilities that required millions of dollars of maintenance, resulting in facilities that were unsafe, unsanitary, and did not meet the requirements set out by law.

136.    Plaintiff Randall, while incarcerated at Southwestern, has been housed in overcrowded cells.

137.    Plaintiff Randall has observed inmates sleeping on the floor while at Southwestern.

138.    Plaintiff Randall has been exposed to mold while at Southwestern.

139.    Plaintiff Randall has also been exposed to rodent feces while in his pod at Southwestern.

140.    Plaintiff Randall has been given inadequate portions of food at Southwestern.

### D.    Class C-Juvenile Center Inmates

141.     Class C includes all currently incarcerated minor individuals who are inmates housed at Kuhn Juvenile Center and other Juvenile Center facilities in West Virginia.

142.     Class C is so numerous that joinder of all members is impracticable.

143.     Members of Class C are fluid, as new individual members are incarcerated at Kuhn and other Juvenile Center facilities daily, and many members are subsequently transferred to another juvenile center.

144.     There are questions of law or fact common to the class.

145.     Class C common questions of fact include whether inmates at Kuhn and other Juvenile Center facilities are or have been exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violate the minimal standards of decency required to pass Constitutional muster.

146.     Common questions of law applicable to Class C include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

147.     The claims of the named Plaintiff are typical of the claims of the class as a whole.

148.     Plaintiff has been subjected to the same constitutional violations as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class members.

149.     The named Plaintiff will fairly and adequately represent and advance the interests of the class.

150.     By filing this action, the named Plaintiff has displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions. By seeking

22

to remedy the violations of their Constitutional rights, the named Plaintiff will also be advancing and proving the claims and rights of absent class members.

151.     There are no antagonistic interests between Plaintiff and the absent members of the class, and the relief sought by the named Plaintiffs will benefit the class generally.

152.     The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

153.     Counsel for the putative class knowledgeable about the conditions of confinement in Kuhn and other Juvenile Center facilities, the constitutional rights of inmates, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation.

154.     Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

### iii.     J.R., Minor-Class C Representative

155.     Plaintiff J.R., Minor was incarcerated at Kuhn Juvenile Center on or about May 31, 2023, and is currently housed there.

156.     Plaintiff J.R., along with all the other inmates, are subject to overcrowded facilities, resulting in conditions that were unsafe, unsanitary, and did not meet the requirements set out by law.

157.     Plaintiff J.R., along with all other inmates, are subjected to facilities that were not properly staffed, resulting in unsafe conditions for all inmates in the jails resulting in conditions that were unsafe, unsanitary, and did not meet the requirements set out by law.

158.     Plaintiff J.R., along with all other inmates, are subject to jail facilities that required millions of dollars of maintenance, resulting in facilities that were unsafe, unsanitary, and did not meet the requirements set out by law.

159.     Plaintiff J.R. has been served undercooked food while at Kuhn.

160.     Plaintiff J.R. has not always had access to hot water since being incarcerated at Kuhn.

## IV.     CAUSE OF ACTION

### EIGHTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
### (Conditions of Confinement)

161.      Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

162.      Defendants, while acting under color of law and within the scope of their employment, violated the Eighth Amendment right of convicted inmates to be free from cruel and unusual punishment.

163.      The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Eighth Amendment to the United States Constitution by depriving them of basic human necessities.

164.      Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

165.      Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates), as described hereinabove, by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

166.     The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

167.     During the time period at issue, it was clearly established that the serious deprivations of basic human needs at MOCC, Southwestern, and Kuhn and all other West Virginia correctional facilities, as described hereinabove, violated the Eighth Amendment to the United States Constitution.

168.     The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

169.     The actions of Defendants, described hereinabove, shock the conscious.

170.     The actions of Defendants, described hereinabove, were unlawful and unjustified.

171.     As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates) are suffering a deprivation of their Constitutional rights

172.     Plaintiffs will also seek to recover, under 42 U.S.C. § 1988, attorneys' fees and cost incurred during the course of this litigation.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated current inmates at all of the states jails, correctional facilities, and juvenile centers request that the Court, and pursuant to 18 U.S.C. § 3626 request:

a) Certify a class pursuant to Federal Rule of Civil Procedure 23 of a class of all individuals currently incarcerated at any correctional facility within the state of West Virginia;

b) Declare under Fed. R. Civ. P. 57 that Defendants' actions and/or inactions, as described hereinabove, violate the Eighth and Fourteenth Amendments to the United States Constitution;

c)  Enjoin, under Fed. R. Civ. P. 65, Defendants from engaging in further unconstitutional practices, as described hereinabove, and compel them to implement and enforce policies, procedures, and practices necessary to ensure the minimal civilized measure of life's necessities and/or the Constitutional thresholds of confinement are provided to all inmates housed in the states jails, correctional facilities, and juvenile centers;

d) Enjoin, under Fed. R. Civ. P. 65, Defendants from engaging in further unconstitutional practices, as described hereinabove, and compel them to make all necessary structural and/or infrastructure repairs, hazard abatements, financial investments, and personnel changes/additions to ensure these constitutional deprivations cease and do not continue in the future;

e) Enjoin and compel, under Fed. R. Civ. P. 65, Defendants to spend state budget surplus funds (or submit bills, call for a special session, etc.)  in order to make all of the necessary deferred maintenance repairs required at all West Virginia correctional facilities in an amount not less than 270 million dollars;

f) Enjoin and compel, under Fed. R. Civ. P. 65, Defendants to spend state budget surplus funds to hire and pay the requisite number of correctional staff needed to appropriately staff  the facilities, not less than 60 million dollars;

g) Enjoin, under 18 U.S.C. § 3626, Defendants from engaging in further unconstitutional practices, as described hereinabove, by the least intrusive means to correcting that harm with respect to all inmates housed in a West Virginia prison;

h) Impose definite time limitations within which the Defendants and the State of West Virginia must comply with the injunction;

i) Award attorney's fees and costs incurred during the course of this litigation, pursuant to 42 U.S.C. § 1988;

j) Grant any and all relief Plaintiffs or class members may be entitled to in law or equity; and ,

k) Grant any further relief this Honorable Court deems just and proper.

**Thomas Sheppheard, Tyler Randall, and Adam Perry, next friend and guardian of Minor child J.P on their own behalf and on behalf of all those similarly situated,**

**By Counsel**

*/s/*Stephen P. New
Stephen P. New (WVSB No. 7756)
Amanda Taylor (WVSB No. 11635)
Emilee B. Wooldridge (WVSB No. 14310)
New, Taylor & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newtaylorlaw.com
mandy@newtaylorlaw.com

Timothy Lupardus (WVSB No. 6252)
The Lupardus Law Office
275 Bearhole Road
Pineville, West Virginia 24874
(304) 732-0250
office@luparduslaw.com

Zachary Whitten (WVSB No. 13709)
The Whitten Law Office
P.O. Box 753
Pineville, West Virginia 24874

zwhittenlaw@gmail.com

Robert Dunlap (WVSB No. 10012)
Robert Dunlap & Associates
208 Main Street
Beckley, West Virginia 25801
(304) 255-4762
robertdunlapesq@gmail.com