IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTIRCT OF WEST VIRGINIA
BECKLEY DIVISION

THOMAS SHEPPHEARD, *et al.*,     )
     )
     Plaintiffs,     )
     )
v.     )     Civil Action No. 5:23-cv-530
     )     (Judge Berger)
     )
JAMES C. JUSTICE, JR.,     )
in his official capacity as Governor of the     )
State of West Virginia; and     )
MARK SORSAIA, in his official capacity     )
as the Cabinet Secretary of the West     )
Virginia Department of Homeland     )
Security,     )
     )
     Defendants.     )
     )

GOVERNOR JUSTICE'S MEMORANDUM OF LAW
SUPPORTING HIS MOTION TO DISMISS

Plaintiffs filed this putative class action case challenging the conditions of confinement in the State's correctional institutions, which they claim are being operated in violation of the Eighth Amendment, suing only the Governor and the Secretary for the Department of Homeland Security in their official capacities. As the remedy, Plaintiffs demand an order compelling the Governor and Secretary to spend no less than $330 million dollars of state funds (either directly or by submitting budget bills for the Legislature's consideration). However, for several independently sufficient reasons, the claim against the Governor must be dismissed.

*First*, state sovereign immunity precludes the claim against the Governor, as the *Ex parte Young* exception does not apply. As the Fourth Circuit has held, lawsuits against a state's governor do not satisfy *Ex parte Young* where the plaintiffs rely solely on the governor's general duty to enforce state law and general control and supervision over a state executive branch. *See*

1

*Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001). The exception limits plaintiffs to suing only those officers with the legal ability to directly remedy the alleged constitutional violation, thereby ensuring that any federal injunction "will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). Not only do Plaintiffs here rely on the sort of general law enforcement and supervisory power rejected by the Fourth Circuit, nowhere do Plaintiffs explain how the Governor has the legal ability to appropriate the funds Plaintiffs now demand he spend to remedy the alleged violations. Nor, in any event, does *Ex parte Young* permit court-ordered spending of state funds that Plaintiffs expressly seek here. *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256–57 (2011) ("*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury. . . .").

      *Second*, for many of the same reasons that the *Ex parte Young* exception is not satisfied, Plaintiffs fail to establish standing. Specifically, Plaintiffs fail to demonstrate that their alleged ongoing injuries are fairly traceable to the Governor's particular conduct or would be redressed by a favorable ruling against the Governor specifically. On either basis, Plaintiffs lack standing.

      *Finally*, Plaintiffs fail to state a claim for relief against the Governor because the Governor has not been deliberately indifferent to the conditions in our State's correctional institutions. Quite the opposite. In fact, *Plaintiffs' own complaint* demonstrates the Governor has for years focused his time and energy seeking to address the alleged risks to health and safety in those facilities. Therefore, Plaintiffs have wholly failed to plausibly allege the subjective element of an Eighth Amendment claim. *See Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994).

      For any or all these reasons, the Governor's motion to dismiss should be granted with prejudice.

## BACKGROUND

On August 8, 2023, Plaintiffs Thomas Sheppheard, Tyler Randall, and Adam Perry (as next friend and guardian to minor child J.P.), on behalf of themselves and putative classes, filed a complaint alleging that West Virginia's correctional institutions are being operated in violation of the Eighth Amendment. As alleged, Plaintiff Sheppheard is an inmate of a state prison, Plaintiff Randall is an inmate of a regional jail, and Plaintiff J.P. is an inmate of a juvenile center.

Plaintiffs allege a single count under 42 U.S.C. § 1983 for violation of the Eighth Amendment challenging the conditions of their confinement. The complaint names only two defendants: James C. Justice, Jr., Governor, and Mark Sorsaia, Secretary of the Department Homeland Security. The defendants are named *only* in their official capacities. The complaint contains extensive factual allegations concerning the state of the conditions in the correctional facilities, including objective awareness of them by public officials in both the state executive and legislative branches, as well as the steps that these officials, including the Governor, have undertaken to try to address and improve them. In their single cause of action against both defendants, Plaintiffs attempt to allege that the Defendants are objectively aware of unconstitutional conditions at state correctional facilities and remain subjectively deliberately indifferent to them, thus amounting to a violation of the Eighth Amendment.

For that violation, Plaintiffs seek truly sweeping relief. In addition to class treatment and a declaratory judgment, Plaintiffs seek to enjoin the Governor and the Secretary from engaging in unconstitutional practices and to "compel" them to [1] "spend state budget surplus funds (or submit bills, call for special session, etc.) in order to make to make all of the necessary deferred maintenance repairs required at all West Virginia correctional facilities in an amount not less than *270 million dollars*;" and [2] to further "spend state budget surplus funds to hire and pay the

requisite number of correctional staff needed to appropriately staff the facilities, not less than *60 million dollars*[.]" ECF No. 1, at *26 (emphases added). In sum, Plaintiffs demand that the alleged Eighth Amendment violations require the Court to issue a judicial decree to the Governor and the Secretary to "spend" (unappropriated) "state budget surplus funds" in the total amount of *no less than $330 million*. The Governor now files this motion to dismiss.

## ARGUMENT

This motion raises three primary arguments, each of which independently requires dismissal of the claim against the Governor. *First*, the claim against the Governor is barred by state sovereign immunity (also called Eleventh Amendment immunity), as the *Ex parte Young* exception does not apply here. *Second*, Plaintiffs fail to establish standing—specifically, the elements of traceability and redressability. *Third and finally*, Plaintiffs fail to state a claim that the Governor has or is violating the Eighth Amendment because they have not plausibly alleged the subjective requirement of deliberate indifference.

Standards of Review. This motion is brought under both Rule 12(b)(1) and Rule 12(b)(6). Although district courts in this Circuit have "not been uniform" as to whether a motion to dismiss based on state sovereign immunity should be reviewed under Rule 12(b)(1) or Rule 12(b)(6), the "recent trend" appears to treat such motions under Rule 12(b)(1). *Shannon v. City of Richmond Va. Sheriff's Office*, 2023 WL 2720806, at *4 n.9 (E.D. Va. Mar. 30, 2023) (quoting *Haley v. Va. Dep't of Health*, 2012 WL 5494306, at *2 n.2 (W.D. Va. Nov. 13, 2012)). The trend includes a decision from this District. *See, e.g.*, *Price v. W. Va. Air Nat'l Guard*, 2016 WL 3094010, at *1 n.2 (S.D. W. Va. June 1, 2016). Regardless, however, the "distinction makes no practical difference" to the adjudication of this motion, as explained below. *Shannon*, 2023 WL 2720806, at *4 n.9.

4

A motion to dismiss an action under Rule 12(b)(1) raises the question of the federal court's power to hear and decide the claims brought before it. "Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: 'facial attacks' and 'factual attacks.'" *Adkins v. United States*, 923 F. Supp. 2d 853, 856 (S.D. W. Va. 2013) (citing *Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir. 1986)). A "facial attack" questions whether "the allegations of the complaint are facially sufficient to sustain the court's jurisdiction." *Thigpen*, 800 F.2d at 401 n.15 (cleaned up). If a "facial attack" is made, the court must accept the factual allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction. *Id*. The sovereign immunity and standing arguments advanced herein constitute facial attacks to subject matter jurisdiction. "The burden of showing the existence of subject matter jurisdiction rests on the plaintiff." *Adkins*, 923 F. Supp. 2d at 857 (citation omitted).

Lastly, assuming that the Court does not dismiss the claim against the Governor based on sovereign immunity and lack of standing, the claim should still be dismissed for failure to state a claim (the standard for which is well-known). *See* Fed. R. Civ. P. 12(b)(6).

## I.     State sovereign immunity bars suit against the Governor.

In our constitutional system, States "retain a residuary and inviolable sovereignty," *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoting The Federalist No. 39, at 245 (James Madison)), which is confirmed by the Eleventh Amendment, *id.* at 728–29. The doctrine of state sovereign immunity recognizes that "it is neither becoming nor convenient . . . that the course of [a State's] public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests." *Ex parte Ayers*, 123 U.S. 443, 505 (1887). In recognizing the importance of state sovereign immunity as an "essential element of the constitutional design," the Eleventh Amendment confirmed a limit on judicial power that "accords States the respect owed them as members of

the federation." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 291 (4th Cir. 2001) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993)).

A state may thus be subject to suit only after Congress abrogates state sovereign immunity under the Fourteenth Amendment or when the State itself clearly and unequivocally consents. *See College Sav. Bank. v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Here, the Governor is sued only in his official capacity, meaning that this suit is effectively against the State, thereby implicating state sovereign immunity. And there has been no abrogation of sovereign immunity by Congress or waiver by the State. As such, Plaintiffs' claim against the Governor in his official capacity is barred by sovereign immunity unless Plaintiffs can establish the exception under *Ex parte Young*, 209 U.S. 123 (1908).

## A.    The *Ex parte Young* exception does not apply.

The *Ex parte Young* exception "permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). "This standard allows [federal] courts to order prospective relief, as well as measures ancillary to appropriate prospective relief," but *does not* permit the award of "retrospective relief," which includes "money damages or its equivalent." *Id*. (cleaned up).

### 1.   Plaintiffs fail to allege the required "special relation" between the Governor and the allegedly unconstitutional conditions of state correctional facilities.

*Ex parte Young* authorizes suits only against officers with "some connection" to the enforcement of the challenged state activity. 209 U.S. at 157. "Without this enforcement duty, the officer is merely 'a representative of the State' who cannot be sued because allowing such a suit would essentially 'make the State a party.'" *Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021) (quoting *Ex parte Young*, 209 U.S. at 157). This "enforcement duty exists when there is a 'special relation'" between the state officer sued and the allegedly unconstitutional statute or

activity, "which provides the officer with the authority to enforce the particular law at issue." *Id*. (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001)).

Critically, however, the Fourth Circuit has repeatedly held that "it is not enough that the officer possesses the '*general authority* to enforce the laws of the state' broadly if the officer cannot enforce the law at issue." *Id*. at 255 (quoting *Waste Mgmt. Holdings*, 252 F.3d at 331) (emphasis in *Doyle*). "Instead, the officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges." *Id*. Put another way, this requirement limits plaintiffs to suing only those officers with the legal ability to directly remedy the alleged constitutional violation, thereby ensuring that any federal injunction "will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).

The Fourth Circuit has repeatedly held that lawsuits against a governor do *not* satisfy the *Ex parte Young* exception where plaintiffs rely solely on a governor's general duty to enforce state law and general power to control and supervise a state executive branch. *See, e.g., Doyle*, 1 F.4th at 255 (Md. Governor); *Waste Mgmt. Holdings*, 252 F.3d at 331 (Va. Governor); *see also Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901–02 (4th Cir. 2022) (same analysis in standing context regarding S.C. Governor). And that is precisely what Plaintiffs rely on here.

Applying this clear line of precedent, federal courts in West Virginia have repeatedly dismissed claims against the Governor of West Virginia and other state constitutional officers, rejecting arguments that rest on the general law enforcement, control, and supervisory authority granted to the Governor under state law. *See, e.g., Sonda v. Justice*, No. 5:22-CV-124, 2022 WL 16707251, at *4 (N.D.W. Va. Sept. 7, 2022); *Penkoski v. Justice*, No. 1:18-CV-10, 2018 WL 6597322, at *5 (N.D.W. Va. Aug. 3, 2018), *report and recommendation adopted*, No. 1:18CV10, 2018 WL 5862582 (N.D.W. Va. Nov. 9, 2018); *Young v. Morrisey*, No. 2:20-CV-00666, 2020

7

WL 10324196, at *3 (S.D.W. Va. Nov. 3, 2020), *report and recommendation adopted*, No. 2:20-CV-00666, 2021 WL 2433798 (S.D.W. Va. June 15, 2021). The outcome here should be no different.

In this case, the only allegations in the complaint that even try to draw an enforcement connection between the Governor's power and the challenged conduct (allegedly creating unconstitutional conditions at correctional facilities) is found in a single paragraph. There, Plaintiffs allege that the Governor is "responsible for [1] submitting a proposed budget for each fiscal year to the legislature for consideration . . . as well as [2] overseeing and carrying out various executive functions including, *inter alia*, corrections." ECF No. 1, ¶ 11. Plaintiffs fail to identify any or direct enforcement power that is specifically granted to the Governor over the conditions of confinement at the state's correctional institutions or for their funding, *Doyle*, 1 F.4th at 255, such that a federal injunction against him "*will be effective* with respect to the underlying claim," *Limehouse*, 549 F.3d at 333 (emphasis added). That is fatal to their case.

The mismatch between the Governor's alleged authority over confinement conditions and the remedies Plaintiffs demand demonstrate the problem. For starters, Plaintiffs do not identify what specific or direct legal authority the Governor has under state law (other than his alleged general right to "oversee[] and carry[] out various executive functions," ECF No. 1, ¶ 11) that would empower him to "implement and enforce policies, procedures, and practices necessary" to remedy the allegedly unconstitutional conditions of confinement, *see* ECF No. 1, at *26 (Prayer for Relief). As the Fourth Circuit has reasoned, plaintiffs *cannot* as a matter of law rely on a governor's general duty to "oversee and carryout various executive functions, including corrections" (ECF No. 1, ¶ 11) to provide the "requisite 'specific connection'" to his ability to remedy the alleged unconstitutional conditions of confinement. *Doyle*, 1 F.4th at 255; *see also*

*Waste Mgmt. Holdings*, 252 F.3d at 331. And though it is well-established in this Circuit that "a general 'supervisory' role does not permit an individual to sue an officer under *Ex Parte Young*," *Doyle*, 1 F.4th at 256, that is precisely what Plaintiffs are trying to do here.

What is more, the Governor does not possess the power to appropriate state funds—a fundamental constitutional power that rests exclusively with the Legislature. *See* W. Va. Const., art. VI, § 51 (providing that no money shall be expended from the treasury except by means of a "budget bill" or by a "supplemental appropriation bill"). Therefore, absent enactment by the Legislature of such appropriation bills, the Governor lacks the legal right to spend state funds. *See State ex rel. League of Women Voters v. Tomblin*, 550 S.E.2d 355, 358–59 (W. Va. 2001). To their credit, Plaintiffs appear to acknowledge this. *See* ECF No. 1, ¶ 11 (alleging that the Governor has a duty to submit a "proposed" budget for the legislature's "consideration"); *id*., at *26 (demanding an order "compel[ling]" the Governor to "spend state budget surplus funds (*or submit bills, call for special session, etc.*)") (emphasis added).

To demonstrate the point, an injunction as requested by Plaintiffs against the Governor would not be "effective" in remedying the alleged unconstitutional conditions by "spend[ing] state budget surplus funds" because the Governor alone (or with the Secretary for that matter) simply lacks the legal authority to appropriate them himself. This is not a case where the plaintiffs are alleging that the Governor is unconstitutionally refusing to spend funds that have already been properly appropriated by the Legislature. The same is true for remedying unconstitutional conditions of confinement by way of "implement[ing] and enforc[ing] policies, procedures, and practices," as Plaintiffs fail to point to *any* specific state law that provides the Governor with direct control over the conditions of confinement in state correctional institutions.

For these reasons, Fourth Circuit precedent compels the dismissal of the Governor based on state sovereign immunity.

### 2. The *Ex parte Young* exception does not permit a federal court to directly order the appropriation of funds from a state treasury.

Even if this Court found the necessary "special relation," the *Ex parte Young* exception would still not apply here to the extent Plaintiffs expressly demand the appropriation of state funds by federal court order in the total amount of "not less" than *$330 million*. ECF No. 1, at *26. It is difficult to conceive of a more fundamental violation of the sovereign rights and dignity of the State of West Virginia than that. Plaintiffs' requested relief not only exceeds the scope of the federal judicial power, but it does so by directly trenching on one of the chief interests served by state sovereign immunity—protection of the public fisc. The Supreme Court has been clear: "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury. . . ." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256–57 (2011).

The case of *Edelman v. Jordan* explained the limits of the relief a court may grant against a State or state officer in his official capacity. In *Edelman*, the plaintiffs sought declaratory and injunctive relief for injuries suffered when a state agency incorrectly administered a federal-state program providing aid to the elderly, blind, and disabled. 415 U.S. 651 (1974). The plaintiffs also sought money damages for all "benefits wrongfully withheld." *Id*. at 656. The Court affirmed the grant of prospective injunctive and declaratory relief but vacated the retroactive monetary award as barred by the Eleventh Amendment. *Edelman* thus prohibited retroactive relief, specifically barring awards of "accrued monetary liability which must be met from the general revenues of a State." *Id*. at 664. The Court recognized, of course, that in some cases, prospective injunctive relief ordering the state to stop violating federal law on an ongoing basis might cost the state money. *Id*. at 667–68. This was deemed acceptable in such cases because

"the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature." *Id*. at 667–68.

In such cases, the state expenditure was an *ancillary* rather than primary effect of the relief ordered and therefore did "not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability." *Milliken v. Bradley*, 433 U.S. 267, 290 n.22 (1977). On the other hand, where ordering payment of state funds is *not* merely "a necessary consequence of compliance in the future with a substantive federal-question determination," such relief is not permissible under *Ex parte Young*. *Edelman*, 415 U.S. at 668 (emphasis added). Put differently, where a plaintiff's request for relief "would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought," it is barred by state sovereign immunity. *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882–83 (7th Cir. 2012) (cleaned up).

Here, Plaintiffs make no pretense about their demand for specific appropriations, which is the "essence of the relief sought." *Id*. It is one thing to order the proper state official defendants to conform their conduct to federal law knowing that *the costs of such conformity* are both ancillary and acceptable under *Ex parte Young*. That's *Edelman*. But here, what Plaintiffs seek is *not only* an order to conform state officials' conduct to federal law with the ancillary effect on the state's treasury but a direct "appropriation" by court order of a specific minimum sum ($330 million) of public funds from the state treasury. *See* ECF No. 1, at *26. That demand for money from the state treasury is not "ancillary" to anything. It is the "essence of the relief sought" and therefore plainly impermissible under *Ex parte Young*. So, the Defendants possess state sovereign immunity for this additional, independent reason.

11

II.       **Plaintiffs lack standing.**

Even if this Court concludes that the *Ex parte Young* exception to state sovereign

immunity is satisfied, Plaintiffs do not have standing to pursue its claim against the Governor

because traceability and redressability are lacking. *See Bostic v. Schaefer*, 760 F.3d 352, 370–71

(4th Cir. 2014) (a plaintiff must establish Article II standing as to "each defendant").

The "judicial Power" extends only to "Cases" and "Controversies." U.S. Const. art. III, §

2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy"

that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek

redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To satisfy the

irreducible constitutional minimum of standing, a plaintiff must have (1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to

be redressed by a favorable judicial decision." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183,

187 (4th Cir. 2018) (cleaned up). Plaintiffs, as "the part[ies] invoking federal jurisdiction, bear[ ]

the burden of establishing these elements." *Spokeo*, 578 U.S. at 338. They cannot do so here.

In this case, Plaintiffs allege that they are being injured by the unconstitutional conditions

of confinement existing in state correctional institutions caused by the failure to appropriate

sufficient public funds for that purpose. Here, Plaintiffs fail to demonstrate that such ongoing

injuries are fairly traceable to the Governor's conduct or would be redressed by a favorable

ruling against the Governor. On either basis, Plaintiffs lack standing to sue the Governor.

A.       **Plaintiffs' injuries are not fairly traceable to the Governor's actions in merely *proposing* budgets.**

A plaintiff's injury satisfies the traceability element of standing when there is "a causal

connection between the injury and the [defendant's] conduct complained of by the plaintiff." *Air

Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (cleaned up). "While the

defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was *caused by the defendant*, as opposed to the 'independent action of some third party not before the court.'" *Id*. (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)) (emphasis added).

Under the circumstances presented here, the Fourth Circuit's traceability analysis applies principles from the *Ex parte Young* context. *See Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Specifically, the question of the causal connection looks to whether the defendant has the power to enforce the complained-of statute or is otherwise empowered under state law to directly remedy the plaintiffs' injuries. *See id*. (applying *Ex parte Young* caselaw). As the Fourth Circuit has made clear, "[t]hese principles apply with equal force in the standing context." *Id*. Application of standing principles means that "[w]hen a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury allegedly caused by that law is not traceable to the defendant." *Disability Rights*, 24 F.4th at 902.

As with the plaintiffs suing Governor McMaster in *Disability Rights*, the plaintiffs here cannot rely on Governor Justice's "general" duty and right to enforce state law and oversee the executive branch to satisfy the traceability element of standing, for the same reasons discussed above. As a result, Plaintiffs have not satisfied their burden to demonstrate the "causal connection" between the existing conditions of confinement and the Governor's "conduct complained of by the plaintiff." *Air Evac EMS*, 910 F.3d at 760 (cleaned up). *Disability Rights* compels dismissal of this action. 24 F.4th at 901–02.

**B.     Plaintiffs' injuries would not be redressed by a favorable ruling.**

"An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S.

167, 181 (2000)). But attempting to satisfy redressability becomes "problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Id.*

An order *against the Governor* enjoining him from engaging in unconstitutional conditions of confinement, compelling him to implement and enforce policies, procedures, and practices aimed at ameliorating such conditions, and compelling him to "spend state budget surplus funds (or submit bills, call for a special session, etc.)" to that same end, would not redress Plaintiffs' claimed injuries. As already explained, Plaintiffs have failed to point to any direct or specific provisions of state law granting *the Governor* specific authority over the conditions of confinement in state correctional institutions and certainly no state law granting the Governor the legal authority to make appropriations, "so such an order would have no effect" on his allegedly unconstitutional conduct. *Disability Rights*, 24 F.4th at 903.

Rather, as Plaintiffs essentially admit in the Prayer for Relief, an order against the Governor to appropriate funds would unquestionably require the "act" of "third persons not party to the litigation" in order for the claimed injury to be "cured." *Doe*, 713 F.3d at 755. Here, that would mean the Legislature. As already explained, the Legislature—not the Governor—has the power of the purse. Accordingly, Plaintiffs fail to demonstrate that an order against the Governor would actually redress their claimed injury.

## III.    Plaintiffs fail to state a claim against the Governor.

Assuming this Court concludes that state sovereign immunity is no bar to seeking relief against the Governor in his official capacity, and that Plaintiffs have demonstrated all the elements of standing, the claim against the Governor should still be dismissed for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). As noted, Plaintiffs allege a single claim against the Governor in his official capacity, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 for violations of the Eighth Amendment. See ECF No. 1, ¶ 161–172. This is the cause of

action recognized by federal courts that is commonly used to challenge conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "proscribes more than physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "In particular, the Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 832) (cleaned up).

Prisoners alleging that they have been subjected to unconstitutional conditions of confinement "must satisfy" the Supreme Court's two-pronged test. *Id*. (citing *Farmer*, 511 U.S. 825). First, the "objective" prong requires plaintiffs to demonstrate that "the deprivation alleged was [or is], objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (cleaned up). For purposes of this motion, the Governor focuses on Plaintiffs' failure to plead sufficient, plausible allegations as to the second, "subjective" prong.

To satisfy the *subjective* element of an Eighth Amendment claim here, "plaintiffs must show that prison officials acted with a 'sufficiently culpable state of mind.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834) (cleaned up). "In conditions of confinement cases, the requisite state of mind is deliberate indifference." *Id*. (citing *Farmer*, 511 U.S. at 834). To prove deliberate indifference, plaintiffs must show that "the official knew of and disregarded an excessive risk to inmate health or safety." *Id*. (quoting *Farmer*, 511 U.S. at 837) (cleaned up). "Put differently, the plaintiff must show that the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and drew that inference." *Id*. (quoting *Farmer*, 511 U.S. at 837) (emphasis in *Scinto*; cleaned up). Critically,

deliberate indifference is "more than mere negligence," but "less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Id*. (quoting *Farmer*, 511 U.S. at 835) (cleaned up). As the Fourth Circuit has observed, it "lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Id*. (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)).

Here, Plaintiffs have failed to plausibly allege that the Governor has acted with deliberate indifference such that the Governor "knew of and disregarded an excessive risk to inmate health or safety." *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 837). Put another way, Plaintiffs do not plausibly allege that the Governor has the state of mind of recklessness "of the subjective type used in criminal law" concerning the conditions in state correctional institutions. *Id*. (cleaned up). In fact, Plaintiffs themselves plead precisely *the opposite*.

The Governor has purposely focused his administration on trying *to fix* the issues facing state correction institutions. Far from "*disregard[ing]* an excessive risk to inmate health and safety," the Governor has resolutely and energetically focused on *affirmatively addressing* the alleged risks to health and safety in these facilities. The Court need go no further than *Plaintiffs' own complaint* to find factual allegations and incorporated public records demonstrating that the Governor, using his legal authority, has undertaken substantial efforts to *improve* conditions in state correctional facilities. Here, Plaintiffs' allegations *undermine if not outright contradict* their conclusory allegation that the Governor has been "deliberately indifferent" to the risks to inmate health and safety. Having failed to plausibly demonstrate the required subjective element of their Eighth Amendment claim, it must be dismissed.

Plaintiffs' factual allegations demonstrating the Governor's subjective commitment to *improving* conditions in state correctional facilities are almost too numerous to mention. *See,*

*e.g.*, ECF No. 1, ¶ 33 (alleging that "Governor Justice issued Executive Order 5-22 finding that: 'A state of Emergency exists in West Virginia as it pertains to the staffing levels of our juvenile and adult detention and correctional facilities.'"); *id.*, ¶ 34 (alleging that the Governor "recognized that 'any shortage of correctional officers limits the ability to properly supervise the State's incarcerated individuals' and lack of proper supervision may present a danger to the incarcerated individuals and others"); *id.*, Ex. 4 (Governor's Executive Order) (authorizing the use of the West Virginia National Guard to help staff juvenile and adult lockups until legislative and operational solutions can be developed and implemented); *id.*, 41 ¶ (alleging that the Governor called in the West Virginia National Guard "to help staff the facilities"); *id.*, ¶ 63 (alleging that "the Governor's office" conferred with the Division of Corrections and Rehabilitation concerning "the deferred maintenance list" at "correctional facilities"); *id.*, ¶ 77 (alleging that "representatives from the Governor's office" were part of "meetings" with legislators and budget office officials concerning the use of funds to "improve . . . issues with West Virginia's jails"); *id.*, ¶ 86 (alleging that the Governor is "planning on spending $100 million on deferred maintenance" at state correctional institutions); *id.*, ¶ 36 n.2 (incorporating document, stating that the Governor has "engag[ed] with a bipartisan group of legislators in order to sponsor a bill that would have afforded a $10,000 locality pay adjustment for Correctional Officers across the state where locality pay is necessary for maintaining critical missions of safety and security"); *id.* (same, quoting the Governor, "Of course, we will continue to work with all stakeholders moving forward to perfect the legislation, get it reintroduced, and, ultimately, get it across the finish line, but we need to do something to address the staffing shortages in our jails right now. These are critical positions and if numbers continue to dip, failure to act could become a safety concern."); *id.* (same, discussing the Governor's detailed

locality pay proposal); *id*., ¶ 38 n.3 (incorporating document, stating that the Governor "is working with state lawmakers toward a resolution" on corrections staffing and that "[a]s soon as a consensus emerges, he said he will call in lawmakers for a special session"); *id*., ¶ 39 n.5 (incorporating document, stating that "House and Senate leaders along with the governor's office have been meeting in recent weeks, working toward a possible solution to the problem of runaway worker vacancy rates in the state's jails and prisons"); *id*. (same, stating that "Justice, who declared a state of emergency last August and put 300 National Guard members in the jails and prisons to help, acknowledged during last week's media briefing that meetings are taking place" and that "Justice has previously supported a pay raise and did so again in comments he made last week"); *id*. (same, noting that the Governor had "floated two previous plans" to address correctional employee compensation); *id*., ¶ 45 & n.10 (stating that the Governor signed a pay raise bill for state correctional employees in 2018 that was implemented over the following three years). These factual allegations are hardly the hallmarks of deliberate indifference.

So not only have Plaintiffs failed to plausibly demonstrate the state of mind of recklessness as to the Governor concerning conditions of confinement, they have affirmatively pleaded the opposite: that the Governor is not only subjectively aware of the issues facing state correctional facilities, but that he has spent his time in office focused on finding solutions to them. Accordingly, Plaintiffs fail to state an Eighth Amendment claim against the Governor.

## CONCLUSION

In addition to the foregoing reasons that warrant dismissal, but to avoid needless repetition, the Governor joins by reference the additional arguments advanced by Secretary Sorsaia supporting his motion to dismiss. *See* ECF 13, at *8–14, 19–25. Accordingly, the Governor's motion to dismiss should be granted with prejudice.

**James C. Justice, II, Governor,**

**By Counsel:**

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
Maureen F. Gleason (WVSB #14452)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
zritchie@hfdrlaw.com
mgleason@hfdrlaw.com

*Counsel for James C. Justice, II, Governor, in his official capacity*