IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTIRCT OF WEST VIRGINIA
BECKLEY DIVISION


| | | |
|---|---|---|
| **THOMAS SHEPPHEARD**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:23-cv-530** |
| | ) | **(Judge Berger)** |
| **JAMES C. JUSTICE, JR.,** | ) | |
| **in his official capacity as Governor of the** | ) | |
| **State of West Virginia; and** | ) | |
| **MARK SORSAIA, in his official capacity** | ) | |
| **as the Cabinet Secretary of the West** | ) | |
| **Virginia Department of Homeland** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendants.** | ) | |


**GOVERNOR JUSTICE'S RENEWED MOTION FOR PROTECTIVE ORDER AND**
**<u>SUPPLEMENTAL RESPONSE TO MOTION TO COMPEL</u>**

The Defendant Governor respectfully submits this renewed motion for protective order to preclude his deposition and that of his Chief of Staff, Brian Abraham ("COS Abraham") and combined supplemental response to Plaintiffs' motion to compel written discovery (ECF No. 52). For the reasons that follow, the Governor's renewed motion for protective order should be granted in full and Plaintiffs' motion to compel denied in full.

## INTRODUCTION

Plaintiffs filed this putative class case challenging the conditions of confinement in the State's correctional institutions, which they claim are being operated in violation of the Eighth Amendment—but sued only the Governor and the Secretary for the Department of Homeland Security in their official capacities for injunctive and declaratory relief. As the remedy, Plaintiffs demand that the federal court order the Governor *to spend* no less than an additional $330 million dollars of *unappropriated state funds*—even though the Governor lacks the power to appropriate—and to otherwise exercise his general power to control and supervise the executive branch to fix the allegedly unconstitutional conditions. The Governor has moved to dismiss on numerous grounds, including state sovereign immunity, standing, and failure to state a claim. *See* ECF Nos. 15–16. The motion remains pending.

In the meantime, Plaintiffs were in such a rush to force the Governor into the deposition chair, they noticed his deposition weeks before any written discovery responses were even served (and before any other deposition had been taken). *See* ECF No. 36. Instead of trying to obtain appropriate deposition testimony from sources other than the Governor, they did exactly the opposite.[1] And so, the Governor filed his original motion for protective order. *See* ECF 47.

---

[1] Plaintiffs failed to explain the urgency in setting the Governor's deposition. At that time, the last date to take depositions was then more than four months away.

The next day, Magistrate Judge Aboulhosn immediately halted the Governor's deposition pending a completion of the briefing. *See* ECF 48. That original motion remains pending.

On a call before the original motion was filed, undersigned counsel asked about the topics on which Plaintiffs' counsel intended to depose the Governor (and, presumably, his Chief of Staff, Brian Abraham). The response was highly troubling. Among other topics, opposing counsel stated his intent to question the Governor regarding (1) the Governor's explanations for his administration's funding *proposals* for the Division of Corrections and Rehabilitation ("DCR") during his administration—including explanations for his proposed budgets and proposed supplementals;[2] (2) explanations for *why the Governor did not call for special sessions* to address corrections; (3) the nature and substance of *internal discussions with and/or reports from his department heads* to him (the Governor and COS Abraham) about corrections, including before the "State of the State" address; and, generally, (4) the Governor's development of policy over the years of his administration to deal with problems in corrections.

Plaintiffs have never suggested that they seek *uniquely personal knowledge* of the Governor or COS Abraham concerning the conditions in state correctional facilities. When opposing counsel was asked if some other witness could testify to such topics, or if counsel was open to discussing some less intrusive means of discovery, the answer was a resounding "no"—it "has to be the Governor"—and, apparently, as a derivative matter, his Chief of Staff.

For numerous reasons, however, Plaintiffs are not entitled to take the deposition of the Governor or COS Abraham—much less on topics that go to the heart of the Governor's discretionary and lawful exercise of core state constitutional prerogatives and policymaking.

---

[2] This category would presumably include questions seeking explanations from the Governor and COS Abraham for the spending of funds provided by the CARES Act.

*First*, the extraordinary circumstances necessary to justify forcing the deposition of a high-ranking government official—particularly the governor of a sovereign state—are manifestly not present here. *Second*, state sovereign immunity and considerations of federalism bar not only the claim against the Governor (as explained in his motion to dismiss) but protect his office (including his COS Abraham) from the burdens of litigation, including discovery. It is difficult to fathom a greater intrusion into the Office of the Governor than a deposition on lawful, discretionary policy decisions—and internal deliberations that occurred in developing the same—which are plainly well-within the state constitutional domain of that high office. Much less are those wholly discretionary funding decisions granted under state constitution the proper subject of intrusive discovery and litigation ordered by federal court decree.

Accordingly, the Governor's renewed motion for protective order should be granted in full and Plaintiffs' motion to compel denied in full.[3]

## BACKGROUND

On August 8, 2023, Plaintiffs Thomas Sheppheard, Tyler Randall, and Adam Perry (as next friend and guardian to minor child J.P.), on behalf of themselves and putative classes, filed a complaint alleging that West Virginia's correctional institutions are being operated in violation of the Eighth Amendment. As alleged, Plaintiff Sheppheard is an inmate of a state prison, Plaintiff Randall is an inmate of a regional jail, and Plaintiff J.P. is an inmate of a juvenile center.

Plaintiffs bring a single count under 42 U.S.C. § 1983, alleging that the conditions of their confinement in West Virginia correctional institutions violate the Eighth Amendment. The complaint names only two defendants: James C. Justice, Jr., Governor, and Mark Sorsaia,

---

[3] This motion also serves as a supplemental response in opposition to Plaintiffs' motion to compel to the extent it seeks written discovery responses concerning discretionary CARES Act funding decisions, which are objectionable for several additional, independently sufficient reasons. *See also* ECF No. 70.

Secretary of the Department Homeland Security. The defendants are named *only* in their official capacities. The complaint contains factual allegations concerning the state of the conditions in the correctional facilities, including objective awareness of them by public officials in both the state executive and legislative branches, as well as the steps that these officials, including the Governor, have undertaken to try to address and improve them. In their single cause of action against both defendants, Plaintiffs attempt to allege that the Defendants are objectively aware of unconstitutional conditions at state correctional facilities and remain subjectively deliberately indifferent to them, thus amounting to a violation of the Eighth Amendment. ***Critically, nowhere in the complaint do the Plaintiffs even mention or make any allegations regarding the spending of CARES Act funds, much less allege any wrongdoing by the Governor's Office respecting the CARES Act funds in connection to the operation of state correctional facilities.***

To establish an Eighth Amendment violation as to conditions of confinement, the plaintiff must satisfy two elements: (1) are the conditions complained of "sufficiently serious"? and (2) did the defendant act with "deliberate indifference" to the conditions complained of? *Wilson v. Seiter*, 501 U.S. 294, 297–304 (1991). Both the objective and subjective prongs of the "deliberate indifference" element must be met—the failure of either is dispositive. *Id.*

For the alleged Eighth Amendment violation, Plaintiffs seek truly sweeping relief. In addition to class treatment and a declaratory judgment, Plaintiffs seek to enjoin the Governor and the Secretary from engaging in generic "unconstitutional practices" and to "compel" them to [1] "spend state budget surplus funds (or submit bills, call for special session, etc.) in order to make all of the necessary deferred maintenance repairs required at all West Virginia correctional facilities in an amount not less than *270 million dollars*;" and [2] to further "spend state budget surplus funds to hire and pay the requisite number of correctional staff needed to appropriately

staff the facilities, not less than *60 million dollars*[.]" ECF No. 9, at 26 (emphases added). In

sum, Plaintiffs demand that the alleged Eighth Amendment violations require the Court to issue a

judicial decree to the Governor (and the Secretary) to "spend" (unappropriated) "state budget

surplus funds" in the total amount of *no less than $330 million*. Defendants each filed motions to

dismiss, which remain pending. *See* ECF Nos. 12–13 & 15–16.

On February 22, 2024, Plaintiffs noticed the deposition of the Governor for March 27.

*See* ECF No. 36. The Governor now renews his motion for a protective order to preclude his

deposition and that of COS Abraham in their entirety.[4]

## ARGUMENT

I.    **A party seeking to depose a high-ranking government official must demonstrate the
presence of extraordinary circumstances to safeguard the deliberative process and
to protect the official from the burdens of unnecessary discovery.**

When a party seeks to depose a state official, the specter of a federal court compelling the

deposition of an executive decisionmaker threatens the "healthy balance of power" between the

Federal government and the States inherent in our system of government. *In re Office of the Utah*

*Attorney General*, 56 F.4th 1254, 1262 (10th Cir. 2022) (issuing writ of mandamus to stop

deposition of Utah Attorney General). Our Founders saw that balance of power as necessary to

"reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458

(1991). The Supreme Court has counseled that "the high respect that is owed to the office of the

Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including

the timing and scope of discovery . . . and that the Executive's constitutional responsibilities and

status [are] factors counseling judicial deference and restraint." *Cheney v. U.S. Dist. Ct.*, 542

---

[4] Plaintiffs have never filed or served a notice of deposition of COS Abraham in this case.

U.S. 367, 385 (2004). Accordingly, only the most compelling circumstances can justify a federal court ordering the deposition of a State's chief executive officer or his highest-ranking deputy.

Courts have long recognized that high-ranking government officials must be protected from compelled testimony *involving their judgment*. The Supreme Court first recognized this policy in 1941, ruling that the Secretary of Agriculture should never have been called to testify about his decision to issue an order setting market rates at certain stockyards. *United States v. Morgan*, 313 U.S. 409, 413 (1941). Comparing the administrative process to the judicial process, the Supreme Court concluded that "[j]ust as a judge cannot be subjected to such scrutiny [of his decisionmaking process], so the integrity of the administrative process must be equally respected." *Id*. at 422. As the Court explained, it is "not the function of the court to probe the mental processes of" high-ranking government officials. *Id*. In other words, courts should protect high-ranking government officials from inquiries into the reasoning and process behind their policy decisions. Since then, *Morgan* has come to stand for the rule that "absent 'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental process in reaching a decision, '*including the manner and extent of his study of the record and his consultations with subordinates*.'" *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991) (quoting *Morgan*, 313 U.S. at 421-22, and collecting cases) (emphasis added). The reasoning behind this rule is two-fold.

*First*, the mental processes of decisionmakers should be protected to create an environment that allows them to make considered and well-informed decisions. *Morgan*, 313 U.S. at 422 ("[I]t was not the function of the court to probe the mental process of the Secretary."). As the Supreme Court recognized in *U.S. v. Nixon*, it is "fundamental to the operation of Government" for government officials to "be free to explore alternatives in the

process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. 683, 708 (1974). The Fourth Circuit has recognized, regarding internal governmental deliberations, that

> [t]he judiciary is not authorized to probe the mental processes of an executive or administrative officer. This salutary rule forecloses investigation into the methods by which a decision is reached, the matters considered, the contributing influences, or the role played by the work of others—results demanded by the exigencies of the most imperative character. No judge could tolerate an inquisition into the elements comprising his decision—indeed, such an examination of a judge would be destructive of judicial responsibility—and by the same token the integrity of the administrative process must be equally respected.

*Franklin*, 922 F.2d at 211 (quotation marks omitted).

*Second*, courts use the "extraordinary circumstances" test not only to address structural concerns, but also to alleviate functional problems. *Lederman v. New York City Dept. of Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013) (affirming protective order halting deposition of Mayor of New York City). It is well recognized that high-ranking government officials, who are generally more likely to be named in litigation, "have greater duties and time constraints than other witnesses." *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993) (issuing mandamus to stop deposition of FDA Administrator). If high-ranking government officials were required to testify in every lawsuit naming or relating to them, those officials would "spend an inordinate amount of time tending to pending litigation." *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (issuing mandamus to bar deposition of Mayor of Boston). In short, the function of government would be "crippled" if courts could "unnecessarily burden" high-ranking government decisionmakers with compelled depositions. *In re Dept. of Educ.*, 25 F.4th 692, 702 (9th Cir. 2022) (issuing mandamus to halt deposition of Secretary of Education).[5]

---

[5] There is no little doubt that the Chief of Staff to the Governor of a sovereign state is considered a high-ranking public official. *See Rogers v. U.S. Dep't of Health and Human Servs.*, 2021 WL 11747920 *5 (D.S.C. Nov. 4, 2021) ("Since there is no dispute that [the Governor's Deputy Chief of Staff and

### A.    The extraordinary circumstances required to justify the depositions of the Governor and COS Abraham are clearly not present here.

To establish the "extraordinary circumstances" required to depose a high-ranking government official, the requesting party must (1) make a showing of bad faith or misconduct; (2) demonstrate that the information sought is essential to the case; *and* (3) establish that the information sought cannot be obtained in any other way. *In re Dept. of Educ.*, 25 F.4th at 702. Unless the requesting party can clearly establish all three elements, a court may not compel the deposition of a high-ranking government official. *In re United States (Reno)*, 197 F.3d 310, 312–13 (8th Cir. 1999) (issuing mandamus to prohibit deposition of U.S. Attorney General and deputy attorney general) (collecting cases).

### 1.    Plaintiffs have not made any showing of bad faith or misconduct.

As to the first element, Plaintiffs here make no showing of bad faith or misconduct. In any event, cursory allegations (much less counsel's mere assertions) of bad faith are insufficient to warrant the deposition of a high-ranking government official. *In re F.D.I.C.*, 58 F.3d 1055, 1062 (5th Cir. 1995) (issuing mandamus to stop deposition of members of Board of Directors of FDIC). Rather, a "clear showing" is required. *Franklin*, 922 F.2d at 211 (vacating order of civil contempt against Director of Office of Thrift Savings for refusing to answer certain

---

Communications Director] were involved in the Governor's decision making process, it stands to reason that the protections afforded the Governor must extend to these subordinates."). *See, e.g., See Coleman v. Schwarzenegger*, No. CIV S-90-0520, 2008 WL 4300437, at *1 (E.D. Cal. Sept. 15, 2008) (governor's chief of staff); *Beelieu v. Board of Trustees of Univ. of W. Fl.*, No. 3:07-cv-30, 2007 WL 9734885 (N.D. Fl. July 18, 2007) (president of public university); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (mayor of Boston). There is no distinction drawn in caselaw between state or federal *constitutional* officers and *statutorily* created officials or staff for purposes of evaluating whether such officials are high-ranking. Nor would drawing a line between constitutional officers and nonconstitutional officers or staff make sense, because, as discussed, the motivating principle is to protect officials with *significant public responsibility* from the burdens of time-consuming litigation. For example, the Fourth Circuit mandamused the Northern District of West Virginia to stop the deposition of the EPA Administrator, clearly a high-ranking official with significant responsibility, but who was not a constitutional officer. *See In re McCarthy*, 636 F. App'x 142 (4th Cir. 2015).

8

interrogatories). Indeed, the party seeking to depose a high-ranking government official must rely on more than the bare allegations in the complaint to establish bad faith or misconduct. (And here, it is simply counsel's say-so). Instead, the requesting party must present "compelling evidence of improper behavior and . . . show that he is entitled to relief as a result." *In re United States (Reno)*, 197 F.3d at 314. For example, in *McCarthy*, the Fourth Circuit halted the deposition of the EPA Administrator, concluding that "we see no clear misconduct" in allegations that she failed to perform a discretionary function. 636 F. App'x at 144-45.

Plaintiffs here have offered no explanation beyond their complaint and other mere assertions that the Governor or COS Abraham engaged in bad faith or misconduct that would entitle them to relief. What is more, Plaintiffs' allegations of misconduct arise solely from the Governor's decision not to perform a discretionary function, like propose a budget to the legislature or call a special session of the legislature. Indeed, the complaint itself alleges that the Governor *did* act to cure identified understaffing issues at West Virginia correctional facilities, by issuing Executive Order No. 5-22. Neither allegation reaches the level of misconduct sufficient to justify the deposition of the Governor or COS Abraham. ***Indeed, the complaint does not so much as mention COS Abraham at all.***

Recently, Plaintiffs have, through counsel, indicated a desire to question the Governor and his Chief of Staff primarily regarding their budget decisions, especially with respect to the CARES Act funds. Yet subjecting the Governor and his Chief of Staff to a deposition or written discovery on a basis not even mentioned in the complaint, including one wholly unnecessary or relevant to proving the cause of action alleged therein would be manifestly unjustifiable.[6]

---

[6] Counsel indicated at this Court's May 31 hearing that he was entitled to ask about CARES Act money to establish the availability of funds for the Governor to spend on corrections facilities. The only information even potentially relevant to Plaintiffs' claims is the fact that West Virginia received money pursuant to the

Moreover, information regarding the decisions in the Governor's Office about the CARES Act money is *available, in depth, publicly*. Any request for use of or expenditure concerning CARES Act funding can be obtained from the person who made the request. Indeed, Plaintiffs have provided the Governor and his Chief of Staff with deposition testimony from Secretary Sandy, Commissioner Jividen, and Commissioner Douglas about their actions surrounding the CARES Act money.

And although the inquiry should stop there, it is important to highlight that Plaintiffs make no clear showing of wrongdoing—a necessary element of the extraordinary circumstances test for deposing high-ranking government officials. Plaintiffs' counsel's assertions regarding the CARES Act hardly amount to a clear showing of bad faith or misconduct, especially when measured against the publicly available testimony of Berkeley Bentley, General Counsel to the Governor, explaining that decision to elected state representatives on the West Virginia Senate Finance Committee.[7]

The testimony makes clear that the issue of CARES Act funding is entirely irrelevant to Plaintiffs' unconstitutional conditions even for purposes of written discovery—particularly since Plaintiffs have *no allegations in their complaint about it whatsoever*. As reflected by that testimony, WVDHS and WVDCR incurred $28.3 million in COVID-related expenses, which

---

CARES Act (and its spending restrictions) and how the money was disbursed—all matters of public record that do not necessitate intrusive discovery of the Governor's Office.

[7] On February 2, 2023, a hearing was held before the West Virginia Senate Finance Committee regarding the use of the CARES Act money. Berkeley Bentley, General Counsel to the Governor, testified as to how the Governor's Office decided to spend the CARES Act money and the measures taken to ensure compliance with the CARES Act requirements. An audio/video recording of that testimony is archived available through the West Virginia Senate website at: https://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20230203/-1/57652#agenda_ (hereinafter "Bentley Senate Testimony").

were paid for out of the State's general revenue fund. **When the State received the CARES Act money, it properly reimbursed itself for those payments by sending $28.3 million to the discretionary Gifts and Grants Fund. At that point, the Governor's Office was free to spend that money without legal restriction.** *See* Bentley Senate Testimony 11:36:27 – 11:47:05. Prior to transferring or spending CARES Act money, the Governor's Office received multiple opinions from outside counsel and an opinion from an outside accounting firm that the transfers complied with the terms of the CARES Act. Indeed, as Mr. Bentley testified, the CARES Act transfers were reviewed during the annual audit of the use of federal funds by the Governor's Office, and no finding of wrongdoing was made. *Id.* at 11:46:41. Plaintiffs make no allegations, much less a clear showing (that is, *evidence*), to the contrary.

The Governor's Office then used $10 million from the Governor's Gifts and Grants Fund to free up money for infrastructure and economic development projects throughout the State. Bentley Senate Testimony 11:42:00 – 11:43:07. As Mr. Bentley explained to the Senate, the Water Development Authority had previously approved a $13.5 million expenditure from the Economic Enhancement Grant Fund (the "EEGF") for long-sought improvements to the Marshall baseball stadium. The Governor, concerned about the financial burden on the EEGF — which is used to fund infrastructure, water/sewer, and economic development projects — decided to alleviate some of the financial burden on the EEGF resulting from the approved Marshall project. As a result, more EEGF money became available for statewide infrastructure improvements and economic development. *Id.* In view of the evidence in the public record no "extraordinary circumstances" exist to justify the deposition of the Governor and his Chief of Staff on this subject—and Plaintiffs have asserted none. And there is no plausible argument that the Governor Office's discretionary application of CARES Act funds is relevant to the elements

of Plaintiffs' unconstitutional conditions claim; indeed, Plaintiffs make no allegations, much less

plausible allegations, that the CARES Act funding issue has anything to do with the particular

conditions in state correctional facilities. For the same reason that a deposition is improper on

this issue, so too would written discovery be inappropriate.

### 2.    The Governor's and COS Abraham's testimony is not necessary.

Turning to the second factor—necessity—the party seeking to depose a high-ranking

government official must show that he has information that is "absolutely needed for a case"

before the court can "allow a deposition to disrupt the normal governmental balance of powers."

*In re Dept. of Educ.*, 25 F.4th at 703. Indeed, the "potentially disruptive nature" of mandating

high-ranking government officials to testify about "relevant, but unnecessary information," is

obvious when considering the sheer number of lawsuits filed against them and their agencies. *Id.*

As Magistrate Judge Aboulhosn recently put it, when the high-ranking government official does

not have information "essential to the case," the deposition will be precluded. *Blankenship v. Fox*

*News Network, LLC*, No. 2:19-cv-236, 2020 WL 7234270 at *1 (S.D.W. Va. Dec. 8, 2020).

Plaintiffs have not explained why the Governor's or COS Abraham's depositions are necessary

or essential for proving up their claim that unconstitutional conditions exist in West Virginia's

correctional institutions. It is difficult to see how the Governor's or COS Abraham's testimony

on the discretionary spending decisions endowed to the Governor under the state constitution

(and not otherwise violative of any federal law) would be relevant to the claim, even if he was a

proper party. And courts considering the same issue in other class action cases alleging Eighth

Amendment violations at state correctional facilities have concluded the same.

In one such case, inmates of San Quentin jail sued the Governor of California at the time,

George Deukmejian, and sought to take his deposition. The court of appeals barred the

deposition. As in this case, the plaintiffs in *Deukmejian* sought to depose the Governor regarding "what he has (without judicial coercion) done about the conditions of confinement in San Quentin and the problems in the California Department of Corrections and of what he intends to do about them." *Deukmejian v. Superior Court*, 143 Cal. App. 3d 632, 634 (Ct. App. 1983) (quoting plaintiffs' brief). The plaintiffs in that case insisted that the Governor's actions and intentions were "central issues" in the case about which no other official could provide information. *Id.* The court found that argument without merit, reasoning that the only factual issue in the case concerned the conditions of confinement in the jails, about which the Governor had no unique personal knowledge. *Id.* at 635. The remaining issues concerned the appropriate remedy, if any, to the plaintiffs' claims. ***As to that line of inquiry, the court observed "a disturbing undercurrent in the argument presented by real parties and accepted by the [lower] court. It is assumed that the court may call the Governor 'on the carpet,' or at least compel him to work in a committee-like atmosphere with the court in order to solve prison problems. We disapprove such a blurring of the lines separating judicial and executive authority." Id.***

Read in the most generous light, Plaintiffs here seek to ask the Governor and COS Abraham why the Governor made certain policy decisions in order to understand the appropriateness of certain remedies (beyond the requested allocation of funds). But, as in *Deukmejian*, such information is not necessary to resolving the merits of this case. And thus, the deposition of the Governor and COS Abraham is not appropriate in this case.

In the other such prison case, inmates at all California prisons sued a litany of California officials, including the Governor and his Chief of Staff, which resulted in the convening of a three-judge panel to hear the case. *See Coleman v. Schwarzenegger*, No. CIV S-90-0520, 2008 WL 4300437, at *1 (E.D. Cal. Sept. 15, 2008). During that dispute, the plaintiffs sought the

deposition of Governor Schwarzenegger and his Chief of Staff, claiming that they had "unique personal knowledge" of facts in issue. *Id.* at *2. Specifically, plaintiffs asserted that they were "entitled to question the Governor and his Chief of Staff about their actions and about the factual bases underlying their actions or statements." *Id*. at *3. Applying the extraordinary circumstances test, the three-judge panel concluded that Plaintiffs had failed to establish that the Governor or his Chief of Staff had "pertinent, admissible, discoverable information which could be obtained *only from him*." *Id.* at *3-4 (emphasis added). As the panel recognized, the information sought was available from other deponents and from the public record. It thus barred the depositions of both the Governor and his Chief of Staff.

In this case, Plaintiffs have, through counsel, indicated a desire to question the Governor (and COS Abraham) regarding his proposed budgets and supplemental appropriations for corrections over the years of his administration (also presumably including CARES Act funding decisions); his internal deliberations and reports (written or oral) from his department heads regarding corrections, including those specifically held before the "State of the State" address; why the Governor did not call a special session at certain time(s) to address correctional issues; and generally the development and formation of correctional policy of the years of his administration. Given that the Governor's Office lacks the power of appropriation—a power exclusively reserved for the Legislature, a non-party—the line of questioning on the budgetary matters is wholly unnecessary to proving the single cause of action: that the conditions of confinement in West Virginia's correctional institutions violate the Eighth Amendment to the U.S. Constitution.

Worse still, the specific intent of Plaintiffs' counsel to interrogate the Governor and his top deputy regarding the internal development of corrections policy, including discussions with

his top department heads, is barred by the executive or deliberative process privilege. Regardless, there is absolutely no need for Plaintiffs to invade *the development* of policy decisions at the highest level of state government and the Governor's *proposed* funding measures to prove their claim that *existing* correctional conditions violate the Eighth Amendment. And, as discussed above, information concerning any assertions of wrongdoing respecting the discretionary CARES Act funding is not essential to Plaintiffs' claim of unconstitutional conditions.

The Governor, with the help of his Chief of Staff, oversees fourteen cabinet secretaries, each of whom oversees a department containing multiple divisions and officials, any of which can be sued for declaratory and injunctive relief under the appropriate circumstances. Theoretically, funding decisions/proposals made by the Governor's office could be tangentially related to a lawsuit against any one department, or division of a department, of the State of West Virginia. Subjecting the Governor and his Chief of Staff to depositions in every such case would cause an indefensible burden upon the operations of the State and demonstrates the extreme nature of Plaintiffs' demand here.

### 3. Plaintiffs fail to show that any relevant information sought from the Governor and COS Abraham cannot be obtained elsewhere.

The third "extraordinary circumstances" factor requires a plaintiff to show that the information sought from the high-ranking government official cannot be obtained elsewhere. In only the "rarest of cases" can the deposition of a high ranking official be ordered where the same information is available from an alternate source. *In re F.D.I.C.*, 58 F.3d at 1062. Importantly, to establish the third factor, the requesting party must show "what efforts have been made to determine whether the information is otherwise available and the extent to which their efforts failed to uncover such information." *Schwarzenegger*, 2008 WL 4300437, at *4. If the requesting

party has not attempted to discover the information from other sources, then it cannot show the necessity of deposing a high-ranking government official. *In re Dept. of Educ.*, 25 F.4th at 704.

Again, Magistrate Judge Aboulhosn has recognized that, where depositions are scheduled for "several others who would also have personal knowledge" of the facts in issue, it is not necessary to depose a high-ranking government official. *Blankenship*, 2020 WL 7234270 at *7 (denying deposition of two U.S. Senators). Here, Plaintiffs themselves supply many of the deposition transcripts containing the information they seek from the Governor. *See* ECF Nos. 9-1, 9-2, 9-3. The deposition transcripts attached to the complaint demonstrate that corrections officials reported certain conditions to the Governor's Office. Indeed, the Governor acted on these reports by issuing Executive Order No. 5-22 (to call for the National Guard to staff jails) within which he made several findings as to the fact that many correctional facilities had fewer staff than required. As explained above, Plaintiffs are not entitled to ask the Governor or COS Abraham *why* the Governor took the actions he did, and *why* he did not take the actions Plaintiffs seek to force where these questions go to the core exercise of the discretionary state constitutional powers of that high office. *See supra* Part I. And all of this also goes for inquiries into the discretionary spending decisions of the Governor's Office for funding provided under the CARES Act, as explained above.

Finally, the fact that the Governor was made a party (improperly) to this case instead of being subject to a third-party subpoena (as in the related *Rose* case), makes no difference to the analysis. The requirements for deposing a high-ranking government official are not lessened simply because that official is a party. *In re McCarthy*, 636 Fed. App'x 142, 145 (4th Cir. 2015) (granting mandamus to prevent deposition of defendant EPA administrator); *see also Bogan v. City of Boston*, 489 F.3d at 423-24 (no abuse of discretion in granting protective order for

deposition of the Mayor); *Sweeny v. Bond*, 669 F.2d 542, 546 (8th Cir. 1982) (district court "did not abuse its discretion in requiring plaintiffs to show specific need" to depose defendant Governor Bond).

*      *      *

Ultimately, Plaintiffs have not come close to making the adequate showing of the extraordinary circumstances necessary to depose such high-ranking government officials. Despite Plaintiffs' counsel's seeming disapproval of the Governor's historical proposed budget requests (which are public record) and other discretionary spending decisions (like CARES) not alleged to have been unlawful (or alleged at all), Plaintiffs make no assertions that the Governor or his Chief of Staff acted outside of the scope of his duties or that his actions resulted from an improper motive. And any such allegation that Plaintiffs' counsel may make in response to this motion or in hearing would merely be conclusory and unsupported by the evidence. Plaintiffs have also failed to demonstrate that the Governor or COS Abraham have pertinent, admissible—or even discoverable—information that can be obtained only from him. As an initial matter, the Governor has no unique personal knowledge as to the conditions of confinement in West Virginia's correctional facilities. Seemingly recognizing that fact, Plaintiffs ask this court to allow them to probe the mental processes of the Governor, *including the manner and extent of his study of the record and his consultations with subordinates*—precisely the manner of questioning prohibited by the Supreme Court in *Morgan* and the Fourth Circuit in *Franklin*.

Finally, and most unfortunately, Plaintiffs' counsel implied that he intends to use the deposition to explore matters far beyond the scope of the claim here—telling the Governor's counsel that "we are going to have all sorts of fun in this case." For instance, Plaintiffs' counsel intends to ask the Governor about the use of COVID funds and "all sorts of stuff." Deposing the

17

Governor and his top deputy on far-reaching topics and "all sorts of stuff" is precisely the mischief the courts strive to prevent when considering whether to allow the deposition of a high-ranking government official.

In sum, no "extraordinary circumstances" exist to justify a federal court compelling the deposition of the Governor of West Virginia or his Chief of Staff. There has been no wrongdoing, the requested information is not essential to the litigation, and much of the sought-after information is clearly subject to the executive or deliberative process privilege.

## II.     State sovereign immunity bars the deposition of the Governor and his Chief of Staff.

In our constitutional system, States "retain a residuary and inviolable sovereignty," *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoting The Federalist No. 39, at 245 (James Madison)), which is confirmed by the Eleventh Amendment, *id.* at 728–29. The doctrine of state sovereign immunity recognizes that "it is neither becoming nor convenient . . . that the course of [a State's] public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests." *Ex parte Ayers*, 123 U.S. 443, 505 (1887).

To give full force to state sovereignty, sovereign immunity serves as immunity from "suit," not just from liability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005). States, in other words, "cannot be subjected to *legal proceedings* at law or in equity without their consent." *The Siren*, 74 U.S. (7 Wall.) 152, 154 (1868) (emphasis added). A "suit" is against the sovereign "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, *or to compel it to act.*" *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (emphasis added). Where sovereign immunity applies, it applies

to the totality of a suit, *which includes discovery*. *Russell v. Jones*, 49 F.4th 507, 514 (5th Cir. 2022); *see also Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997) (recognizing that when the defense of sovereign immunity is properly invoked, the bar is "absolute").

In this case, the Governor and his Chief of Staff are entitled to state sovereign immunity so that they may not be subject to the burdens of litigation, including deposition. Plaintiffs sued the Governor only in his official capacity, meaning that this suit is effectively against the State, thereby implicating state sovereign immunity. (So too, the demand for discovery from COS Abraham irrefutably concerns his official conduct). And there has been no abrogation of sovereign immunity by Congress or waiver by the State. As such, Plaintiffs' claim against the Governor in his official capacity is barred by sovereign immunity unless Plaintiffs can establish the exception under *Ex parte Young*, 209 U.S. 123 (1908). This doctrine applies with equal force to non-party officials from which discovery is sought in their official capacities. See *Russell v. Jones*, 49 F.4th 507, 512–16 (5th Cir. 2022).

### A.     The *Ex parte Young* exception does not apply to permit the deposition of the Governor.

The *Ex parte Young* exception "permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). "This standard allows [federal] courts to order prospective relief, as well as measures ancillary to appropriate prospective relief," but *does not* permit the award of "retrospective relief," which includes "money damages or its equivalent." *Id*. (cleaned up).

Plaintiffs fail to allege the required "special relation" between the Governor (or his COS) and the allegedly unconstitutional conditions of state correctional facilities. *Ex parte Young* authorizes suits only against officers with "some connection" to the enforcement of the challenged state activity. 209 U.S. at 157. "Without this enforcement duty, the officer is merely

'a representative of the State' who cannot be sued because allowing such a suit would essentially 'make the State a party.'" *Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021) (quoting *Ex parte Young*, 209 U.S. at 157). This "enforcement duty exists when there is a 'special relation'" between the state officer sued and the allegedly unconstitutional statute or activity, "which provides the officer with the authority to enforce the particular law at issue." *Id.* (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001)).

Critically, however, the Fourth Circuit has repeatedly held that "it is not enough that the officer possesses the '*general authority* to enforce the laws of the state' broadly if the officer cannot enforce the law at issue." *Id.* at 255 (quoting *Waste Mgmt. Holdings*, 252 F.3d at 331) (emphasis in *Doyle*). "Instead, the officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges." *Id.* Put another way, this requirement limits plaintiffs to suing only those officers with the legal ability to directly remedy the alleged constitutional violation, thereby ensuring that any federal injunction "will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).

The Fourth Circuit has repeatedly held that lawsuits against a governor do *not* satisfy the *Ex parte Young* exception where plaintiffs rely solely on a governor's general duty to enforce state law and general power to control and supervise a state executive branch. *See, e.g.*, *Doyle*, 1 F.4th at 255 (Md. Governor); *Waste Mgmt. Holdings*, 252 F.3d at 331 (Va. Governor); *see also Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901–02 (4th Cir. 2022) (same analysis in standing context regarding S.C. Governor). And that is precisely what Plaintiffs rely on here.

Applying this clear line of precedent, federal courts in West Virginia have repeatedly applied state sovereign immunity to shield the Governor of West Virginia and other state constitutional officers from the burdens of trial, rejecting arguments that rest on the general law

enforcement, control, and supervisory authority granted to the Governor under state law. [8]The outcome here should be no different.

In this case, the only allegations in the complaint that even try to draw an enforcement connection between the Governor's power and the challenged conduct (allegedly creating unconstitutional conditions at correctional facilities) is found in a single paragraph. There, Plaintiffs allege that the Governor is "responsible for [1] submitting a proposed budget for each fiscal year to the legislature for consideration . . . as well as [2] overseeing and carrying out various executive functions including, *inter alia*, corrections." ECF No. 9, ¶ 11. Plaintiffs fail to identify any direct enforcement power that is specifically granted to the Governor over the conditions of confinement at the state's correctional institutions—or for their funding—*Doyle*, 1 F.4th at 255, such that a federal injunction against him "*will be effective* with respect to the underlying claim," *Limehouse*, 549 F.3d at 333 (emphasis added). That is fatal to their demand to subject the Governor to deposition, as well as (derivatively) his Chief of Staff.

The mismatch between the Governor's alleged authority over confinement conditions and the remedies Plaintiffs demand demonstrates the problem. For starters, Plaintiffs do not identify what specific or direct legal authority the Governor has under state law (other than his alleged general right to "oversee[] and carry[] out various executive functions," ECF No. 9, ¶ 11) that would empower him to "implement and enforce policies, procedures, and practices necessary" to remedy the allegedly unconstitutional conditions of confinement, *see* ECF No. 9, at *26 (Prayer for Relief). As the Fourth Circuit has reasoned, plaintiffs *cannot* as a matter of law rely on a

---

[8] *See, e.g., Sonda v. Justice*, No. 5:22-CV-124, 2022 WL 16707251, at *4 (N.D.W. Va. Sept. 7, 2022); *Penkoski v. Justice*, No. 1:18-CV-10, 2018 WL 6597322, at *5 (N.D.W. Va. Aug. 3, 2018), *report and recommendation adopted*, No. 1:18CV10, 2018 WL 5862582 (N.D.W. Va. Nov. 9, 2018); *Young v. Morrisey*, No. 2:20-CV-00666, 2020 WL 10324196, at *3 (S.D.W. Va. Nov. 3, 2020), *report and recommendation adopted*, No. 2:20-CV-00666, 2021 WL 2433798 (S.D.W. Va. June 15, 2021).

governor's general duty to "oversee and carry out various executive functions, including corrections" (ECF No. 9, ¶ 11) to provide the "requisite 'specific connection'" to his ability to remedy the alleged unconstitutional conditions of confinement. *Doyle*, 1 F.4th at 255; *see also Waste Mgmt. Holdings*, 252 F.3d at 331. And though it is well-established in this Circuit that "a general 'supervisory' role does not permit an individual to sue an officer under *Ex Parte Young*," *Doyle*, 1 F.4th at 256, that is precisely what Plaintiffs are trying to do here.

What is more, the Governor (or COS Abraham) do not possess the power to appropriate state funds—a fundamental constitutional power that rests exclusively with the Legislature. *See* W. Va. Const., art. VI, § 51 (providing that no money shall be expended from the treasury except by means of a "budget bill" or by a "supplemental appropriation bill"). Therefore, absent enactment by the Legislature of such appropriation bills, the Governor lacks the legal right to spend state funds. *See State ex rel. League of Women Voters v. Tomblin*, 550 S.E.2d 355, 358–59 (W. Va. 2001). To their credit, Plaintiffs appear to acknowledge this. *See* ECF No. 9, ¶ 11 (alleging that the Governor has a duty to submit a "proposed" budget for the legislature's "consideration"); *id*., at 26 (demanding an order "compel[ling]" the Governor to "spend state budget surplus funds (*or submit bills, call for special session, etc.*)") (emphasis added).

To demonstrate the point, an injunction as requested by Plaintiffs against the Governor would not be "effective" in remedying the alleged unconstitutional conditions by "spend[ing] state budget surplus funds" because the Governor alone (or with COS Abraham for that matter) simply lacks the legal authority to appropriate them himself. ***This is not a case where the plaintiffs are alleging that the Governor is unconstitutionally refusing to spend funds that have already been properly appropriated by the Legislature for a specifically identified purpose. The Complaint makes no such allegations.*** The same is true for remedying

unconstitutional conditions by way of "implement[ing] and enforc[ing] policies, procedures, and practices," as Plaintiffs fail to point to *any* specific state law that provides the Governor or Chief of Staff Abraham with direct control over the particular conditions of confinement in state correctional institutions.

## CONCLUSION

For the foregoing reasons and those set forth in prior briefing, the Governor's renewed motion for protective order should be granted in full and Plaintiffs' motion to compel denied in full.[9]

To the extent that this Court denies any part of the Governor's renewed motion for protective order and grants any part of Plaintiffs' motion to compel (ECF No. 52), the Court should stay the effectiveness of any such order pending the orderly adjudication of objections filed thereto with the District Court pursuant to Federal Rule of Civil Procedure 72(a) and any timely further appeal therefrom, if necessary, to the United States Court of Appeals for the Fourth Circuit.

> **James C. Justice, II, Governor,**
> **By Counsel:**
>
> /s/ Michael B. Hissam
> Michael B. Hissam (WVSB #11526)
> J. Zak Ritchie (WVSB #11705)
> Maureen F. Gleason (WVSB #14452)
> HISSAM FORMAN DONOVAN RITCHIE PLLC
> P.O. Box 3983
> Charleston, WV 25339

---

[9] As a matter of good faith, the Governor's Office has voluntarily disclosed certain responsive, non-privileged documents in response to the document requests where those documents would otherwise be subject to disclosure under the West Virginia Freedom of Information Act, *see* W. Va. Code § 29B–1–1, *et seq*. By so doing, Governor Justice and COS Abraham do not waive their objections or defenses otherwise raised in this proceeding. *See also Beaulieu v. Vermont*, 807 F.3d 478, 491 (2d Cir. 2015) (litigation actions of a state officer cannot waive state sovereign immunity).

681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
zritchie@hfdrlaw.com
mgleason@hfdrlaw.com

*Counsel for James C. Justice, II, Governor, in his
official capacity*