# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# BECKLEY DIVISION

| | |
|---|---|
| **THOMAS SHEPPHEARD,** ) | |
| **TYLER RANDALL, and** ) | |
| **ADAM PERRY, next friend** ) | |
| and guardian of Minor child J.P., ) | |
| on their own behalf and on behalf ) | |
| of all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 5:23-cv-00530 |
| ) | (Judge Berger) |
| **JAMES C. JUSTICE JR.,** ) | |
| in his official capacity as Governor of ) | |
| the State of West Virginia, and ) | |
| **MARK SORSAIA,** in his official ) | |
| capacity as the Cabinet Secretary ) | |
| of the West Virginia Department ) | |
| of Homeland Security, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO GOVERNOR JUSTICE'S RENEWED MOTION FOR PROTECTIVE ORDER AND SUPPLEMENTAL RESPONSE TO MOTION TO COMPEL

**COME NOW** Plaintiffs, by counsel, and file their *Response in Opposition to Governor Justice's Motion for Protective Order and Supplemental Response to Motion to Compel*, stating as follows:

### I.   STATEMENT OF THE CASE

This is a class action suit filed against James C. Justice Jr. ("Governor Justice" or jointly "Defendants"), in his official capacity as Governor of the State of West Virginia, and Mark Sorsaia ("Defendant Sorsaia" or jointly "Defendants"), in his official capacity as the Cabinet Secretary of the West Virginia Department of Homeland Security ("WVDHS") seeking to remedy violations

of the Eighth Amendment's prohibition against cruel and unusual punishment in West Virginia prisons, jails, and juvenile facilities.

Count I of the *Complaint* alleges *Eighth Amendment* violations in the prison system and seeks injunctive relief to remedy the unconstitutional conditions that Defendants have permitted to persist. Plaintiffs allege that Defendants violated their constitutional rights guaranteed under the *Eighth Amendment* by depriving them of basic human necessities, cruel and unusual punishment, and denying care for serious medical needs. *See, Complaint* ("*Compl.*") (Document 9) at ¶163. Defendants are alleged to have been "deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates)" and to have had "actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner." *See id*. at ¶165.

Specifically, Plaintiffs allege that "[t]he actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law." *See id*. at ¶166. Further, Plaintiffs allege that "[d]uring the time period at issue, it was clearly established that the serious deprivations of basic human needs at MOCC, Southwestern, and Kuhn and all other West Virginia correctional facilities, as described hereinabove, violated the Eighth Amendment to the United States Constitution." *See id*. at ¶167. Plaintiffs allege that as a result of the unconstitutional conduct of the Defendants, "Plaintiffs (and all similarly situated inmates and former inmates) are suffering a deprivation of their Constitutional rights." *See id*. at ¶168.

## II.  STATEMENT OF FACTS

The Complaint alleges that Plaintiff Thomas Sheppheard, ("Plaintiff Sheppheard") was incarcerated at Mt. Olive Correctional Complex ("MOCC") in Fayette County; Plaintiff Tyler

2

Randall, ("Plaintiff Randall") was incarcerated at Southwestern Regional Jail ("Southwestern") in Logan County; and, Plaintiff J.P., ("Plaintiff J.P."), a minor, is an inmate incarcerated at Donald R. Kuhn Juvenile Center ("Kuhn") in Boone County. *See* Complaint (Document 9) at ¶¶ 7-9.

Defendant Governor Justice is the duly elected Governor of the State of West Virginia and is sued in his official capacity. *See id.* at ¶¶10 and 14. Governor Justice is responsible for submitting a proposed budget for each fiscal year to the legislature for consideration pursuant to W. Va. Const. art. VI, § 51, as well as overseeing and carrying out various executive functions including, *inter alia*, corrections. *See id.* at ¶11.

The State of West Virginia is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in any correctional facility. *See id.* at ¶20. The State of West Virginia is similarly charged with maintaining and operating its correctional facilities in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste or sewage, rats, insects, and other contaminants for all inmates housed therein. *See id.* at ¶21. The State of West Virginia is tasked by law with ensuring that all correctional facilities are free from the conditions of overcrowding, understaffing, and are properly maintained and it has failed in this regard for over a decade. *See id.* at ¶22. Despite the constitutional requirements set forth in the *Eighth Amendment,* Defendants have subjected inmates housed at all the states correctional facilities and other such facilities throughout the state, including Plaintiffs, to inhumane living conditions, deprived them of basic human necessities, and acted with deliberate indifference towards their health and safety. *See id.* at ¶28.

On August 11, 2022, Governor Justice issued Executive Order 33. 5-22 finding that: "A state of Emergency exists in West Virginia as it pertains to the staffing levels of our juvenile and adult detention and correctional facilities." *See id.* at ¶33. Governor Justice recognized that "any shortage of correctional officers limits the ability to properly supervise the State's incarcerated individuals" and lack of proper supervision may present a danger to the incarcerated individuals and others. *See id.* at ¶34. Three hundred National Guard members were inserted into in the jails and prisons to help with the severe understaffing in the late summer of 2022. *See id.* at ¶35.

Meetings between WVDHS and WVDCR officials and legislators, representatives from the Governor's office, of the Legislature, and State budget office officials have occurred wherein these individuals were informed that using part of the money from the budget surplus would greatly improve a lot of the issues. *See id.* at ¶77. These government officials would be presented with written proposals with options as to how to correct the overcrowding, understaffing, and deferred maintenance problems within the facilities. *See id.* at ¶78. The state is not lacking in funds to address the unconstitutional conditions at the facilities as the state ended the 2023 fiscal year with a $1.8 billion dollar surplus and according to Governor Justice, "shattering the all-time record for biggest single-year revenue surplus in state history for the second straight year in a row." *See id.* at ¶¶83-84.

A *Notice of Deposition Duces Tecum* (Document 36) was served upon Governor Justice on February 22, 2024 for his deposition on March 27, 2024. On March 20, 2024, seven days prior to the scheduled deposition, Governor Justice filed a *Motion for Protective Order*. (Document 47) ("*Motion*") contending that he cannot be deposed as he is a high-ranking government official. Governor Justice also reasserts his argument that he is entitled to sovereign immunity and cannot be deposed.

Plaintiffs responded to the *Motion*. See, *Plaintiffs' Response in Opposition to Governor Justice's Motion for Protective Order* ("*Plaintiffs' Response* ") (Document 49). On June 24, 2024, Governor Justice filed his *Governor Justice's Renewed Motion for Protective Order and Supplemental Response to Motion to Compel* ("*Renewed Motion")* (Document 109) seeking to prohibit the depositions of Governor Justice and Chief of Staff Brian Abraham ("COS Abraham").[1] The *Renewed Motion* also addresses *Plaintiffs' Motion to Compel Defendant Justice to Respond Fully and Adequately to Discovery* ("*Motion to Compel*") (Document 53), specifically focusing on Request for Production No. 15 and 25 seeking information "relating to CARES Act funding (or other federal funding) requested by, requested for, or allocated to the WVDCR." Governor Justice, however, only addresses information regarding the CARES Act funding.

Excluding the arguments regarding the CARES Act, Governor Justice's *Renewed Motion* substantially reiterates the original *Motion* and Plaintiffs are also substantially reiterating the arguments. Additionally, Governor Justice seeks to preclude the deposition of COS Abraham.

Essentially, Governor Justice latches onto the argument the *Complaint* does not specifically reference the CARES Act ignoring the fact that the *Complaint* alleges, in part, that:

> Based upon information and belief, as of April 2022, West Virginia's correctional facilities were in serious need of maintenance that is only getting worse and the WVDOCR talked to the Legislature, the Department of Homeland Security, the Governor's office, and everybody they could talk to over the last few years about the deferred maintenance list. (Exhibit 1, Douglas Depo., pp. 25, 31, and 33.)

*Complaint* (Document 8) at ¶ 63.

Paragraphs 63 through 76 set forth allegations regarding deferred maintenance, including allegations that Twenty-Seven Million Dollars is needed for door locking control systems and doors and locks in the jails only and some of the prisons and juvenile centers also need these items.

---

[1] Plaintiffs' arguments regarding Governor Justice are applicable to COS Abraham and Plaintiffs will not repeatedly refer to both of them throughout this *Response* as was done in the *Renewed Motion*.

5

*Id.* at ¶ 73 (citing, Exhibit 1, Douglas Depo., pp. 44-46). Additionally, Plaintiffs further alleged that the lack of locking mechanisms "can present a risk of harm to inmates as inmates need to be prevented from being able to access other inmates during lockdowns or at night when an inmate is sleeping. *Id.* at ¶ 74 (citing, Exhibit 1, Douglas Depo., p. 46). An additional allegation is that "sufficient money is not being allocated to keep up with the deferred maintenance in the facilities." *Id.* at ¶ 76 (citing, Exhibit 1, Douglas Depo., p. 38).

Governor Justice acknowledges that Plaintiffs must establish deliberate indifference. *Renewed Motion* at p. 4. Counsel for Plaintiffs explained that the expenditure of the CARES Act money "goes directly to the heart of deliberate indifference." *Transcript of Motions Hearing Held before The Honorable Cheryl A. Eifert, Magistrate Judge United States District Court in Huntington, West Virginia*, May 31, 2024 ("*Trans.*") at p. 39. Specifically, if $28 million of CARES Act funding was in the Governor's Discretionary Fund, then some or all of that money could have been spent on correcting the locks any other unconstitutional violation rather than paying for astroturf.

### III. LAW AND ARGUMENT

**A. Plaintiffs satisfy the extraordinary circumstances requirement and a protective order is unwarranted.**

Governor Justice begins his argument with the citation to cases that set forth the general legal principles applicable to the development and utilization of the "exceptional circumstances" test when determining whether a high-ranking government official is to be subject to discovery. Perhaps the most instructive of these cases is the analysis contained in a case addressing the whether United States District Court for the District of Columbia erred in issuing discovery orders directed to Vice President Chaney and other senior officials to provide information about a task force established by the President. *Cheney v. United States Dist. Court*, 542 U.S. 367, 372, 124 S.

Ct. 2576 (2004). The plaintiffs sought information generated by the task force on the basis that individuals who were not Federal Government employees "'regularly attended and fully participated in non-public meetings.'" *Id.* at 374. Plaintiffs contended that the inclusion of these additional individuals imposed certain "'procedural and disclosure requirements of the Federal Advisory Committee Act.'" *Id.* at 373. Thus, the presence of the non-employee individuals would permit disclosure of information related to the task force.

The United States Supreme Court explained that a balancing must occur between the completing interests, that is, the protection of the functions related to a high-ranking government official and the need for the information sought. Thus, the Supreme Court contrasted the need for information in a criminal prosecution where constitutional safeguards are afforded an accused and the need for information in a civil suit seeking to obtain information regarding a task force. *Id.* at 383. In the former instances, an executive is required to assert an executive privilege, which is to be narrowly construed, while the Supreme Court held that such an assertion was not required in a civil action such as brought by the plaintiffs. *Id.* at 384. The gravamen of this dichotomy rested on the constitutional rights of the accused.

The case *sub judice*, while a civil action, alleges the violation of the Plaintiffs and putative class members' rights secured under the United States Constitution and, thus, has "constitutional dimensions" that support a lesser degree of protection for the executive privilege. *Id.* (citation and internal quotation marks omitted). More importantly, the Supreme Court reaffirmed that courts must have information to carry out their constitutional functions under Article III.

> The Court also observed in *Nixon* that a 'primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions.' *Id.,* at 707, 41 L.Ed. 2d 1039, 94 S. Ct. 3090. Withholding materials from a tribunal in an ongoing criminal case when the information is necessary to the court in carrying out its tasks 'conflict[s] with the function of the courts under Art. III.' *Ibid.* Such an impairment of the 'essential functions of [another] branch,' *ibid.*, is impermissible. Withholding the

7

> information in this case, however, does not hamper another branch's ability to perform its 'essential functions' in quite the same way. *Ibid.*

*Id.*

The argument of Governor Justice focuses on the confidentiality protections for his actions and the unacceptable burdens he believes would be imposed by the taking of his deposition. Governor Justice does not focus on the fact that Plaintiffs are claiming a violation of their constitutional rights; nor does he address the fact that this Court is constitutionally empowered and required to protect those constitutional rights. Rather, Governor Justice solely proffers general propositions of law, as if this case were being decided in a vacuum. In determining whether Governor Justice is entitled to a protective order, the analysis must focus on all of the parties and this Court's constitutional power, rather than solely on the protections afforded Governor Justice.

Neither Governor Justice nor the State of West Virginia possesses the power to violate the *Constitution of the United States*. *See*, *Xiaoxing Xi v. Haugen*, 68 F.4th 824, 829 (3d Cir. 2023) ("[B]ecause the Government has no discretion to violate the Constitution, FTCA claims premised on conduct that is plausibly alleged to violate the Constitution may not be dismissed on the basis of the discretionary function exception."); *Loumiet v. United States*, 424 U.S. App. D.C. 113, 122, 828 F.3d 935, 944 (2016) (citation omitted)) ("A constitutional limit on governmental power [. . .] circumscribes the government's authority even on decisions that otherwise would fall within its lawful discretion. The government 'has no "discretion" to violate the Federal Constitution; its dictates are absolute and imperative.'"); *Annappareddy v. Lating*, No. 1:18-cv-03012-JFA, 2023 U.S. Dist. LEXIS 45687, *32 (D. Md. Mar. 16, 2023) (*citing*, *Loumiet*); *State v. Chase Sec.*, 188 W. Va. 356, 364, 424 S.E.2d 591, 599 (1992) (equating ministerial/non-discretionary acts with violation of a "clearly established precept of law").

Plaintiffs recognize that certain protections are afforded high-ranking government officials; however, those protections must be weighed against the allegations of unconstitutional conditions of confinement. In the circumstance of the case *sub judice*, Plaintiffs have established that exceptional circumstances exist that justify the deposition of Governor Justice.

### 1. The extraordinary circumstances required to justify the deposition of the Governor are clearly present here.

#### a. Plaintiffs have made a showing of bad faith or misconduct.

Governor Justice often chooses to rewrite Plaintiffs' *Complaint* in this matter by selectively focusing on isolated allegations without considering the entire *Complaint* in its context. Governor Justice contends that Plaintiffs have not shown bad faith or misconduct. Plaintiffs' allegations of misconduct arise from the failure to remedy the unconstitutional conditions that are prevailing and continue to prevail throughout West Virginia's correctional system.

Indeed, Plaintiffs' allegations are similar to those that prompted the United States District Court for the Northern District of California to deny a motion to quash a subpoena directed to the former United States Secretary of Homeland Security in a case brought under the Federal Tort Claims Act. *See*, *In re A Subpoena to Testify at A Deposition in A Civil Action Addressed to the Hon. Kirstjen Nielsen*, No. 4-23-mc-80280-KAW, 2024 U.S. Dist. LEXIS 43258 (N.D. Cal. Jan. 24, 2024). Plaintiffs in that case sought damages resulting from the separation from their children during the immigration process in the United States. In discussing whether bad faith was demonstrated, the Magistrate Judge stated:

> Indeed, it was well documented by the media that the Zero Tolerance Policy resulted in separated children being placed into literal cages, where they were forced to sleep on the floor with Mylar blankets and denied the most basic of care. When these atrocities were being inflicted on children, Secretary Nielsen was on record saying that the children were well cared for, and she repeatedly denied that they were being housed in cages despite media coverage showing the contrary.

9

*Id.* at *18.

Similar to the children of the immigrants, Plaintiffs herein allege they were denied the most basic of care in West Virginia's prisons, jails, and juvenile facilities. Furthermore, similar to the Secretary of Homeland Security, Governor Justice has provided incongruous statements regarding the conditions in the correctional facilities in West Virginia, specifically, because of Governor Justice's failings. West Virginia's inmates and pretrial detainees have been subjected to the unconstitutional conditions of overcrowding, understaffing, and delayed maintenance, all at levels, which violate the U.S. Constitution. Inmate deaths have been rampant, as have inmate beatings and assaults. Overdoses, because of a failure to adhere to a contraband policy, kill and injure many inmates on a daily basis. Finally, the State has permitted vendors like Aramark and Wexford Health Sources, Inc. to neglect food, nutrition, and basic medical care for inmates.

Governor Justice, in Executive Order 5-22 issued on August 11, 2022, stated "[a] State of Emergency exists in West Virginia as it pertains to the staffing level of our juvenile and adult detention and correctional facilities." (Document 9-4, at p. 2, ¶1). Yet, Governor Justice fails to admit that understaffing has been an issue in West Virginia's Correctional facilities for a number of years. *See*, *Responses And Answers To Plaintiffs' First Interrogatories, Requests For Production, And Requests For Admission To Defendant Governor James Justice II* ("*Discovery Responses*"), at pp. 52-53, attached hereto as Exhibit A.

Governor Justice proclaimed that "we had people that purposefully covered stuff up."[2] He also proclaimed that: "So there's lots and lots of folks dropping the ball along the way, and I want

---

[2] *See*, https://wvmetronews.com/2023/11/19/as-governor-describes-another-look-at-jail-system-focus-could-be-on-conditions-or-accountability/ (accessed March 24, 2024).

to be the person that stands up and says 'Doesn't really matter to me — at the end of the day, I don't care who's dropping the ball: We've got to fix it.'"[3]

Plaintiffs allege that,

According to West Virginia's recently retired Secretary of WVDHS and WVDCR Chief of Staff, meetings with legislators, representatives from the Governor's office, of the Legislature, and State budget office officials have occurred wherein these individuals were informed that using part of the money from the budget surplus would greatly improve a lot of the issues with West Virginia's jails.

*Complaint* (Document 9), at ¶ 77 (referencing Exhibit 1, Douglas Depo., p. 77; Exhibit 3, Sandy Depo., p. 30- 31).

Plaintiffs further allege that:

Likewise, these government officials would be presented with written proposals with options as to how to correct the overcrowding, understaffing, and deferred maintenance problems within the facilities.

*Complaint* (Document 9), at ¶ 77 (referencing Exhibit 2, Jividen Depo., p. 167; Exhibit 3, Sandy Depo., p. 103-105).

Thus, either the deponents are incorrectly stating that the Governor's office was aware of the ongoing problems with the correctional facilities or Governor Justice is incorrect in stating that there was a "cover up." The conflicting proprositions can only be properly address through the testimony of Governor Justice.

Moreover, when requested to provide annual reports from January 1, 2018 to the present, Governor Justice responded that "The Governor's Office does not maintain the operational records of the regional jails[…]. Each year the Governor is provided with, an annual report from the WVDOCR, specifically directed to him. *See e.g.*, "WVDOCR FY 2023 Annual Report," pp. 1-3, attached as Exhibit B. These reports are prepared pursurant to Chapter § 5-1-20 of the *West*

---

[3] *Id.*

*Virginia State Code*, Reports to the Governor. *Id*. at p. 2. Apparently, these annual reports are "not maintained" or the Governor discards them.

Further, in Governor Justice's Rule 26(a)(1) disclosure regarding the name and telephone number of each individual likely to have discoverable information regarding Governor Justice's defenses, Governor Justice responsed "None." *See*, *Governor Justice's Rule 26(A)(1) Initial Disclosures*, attached hereto as Exhibit C. Therefore, only the Governor can speak to his defenses.

Plaintiffs allege that the Defendants were objectively aware of unconstitutional conditions at state correctional facilities and remain subjectively deliberately indifferent to them. *See*, *Motion* (Document 47), at p. 4. Governor Justice denies being aware of the unconstiutional conditions despite the fact that other witnesses testified under oath that the Governor's office was made aware of the conditions and provided with the means to correct them, that is, spending the state surplus. Even if the Governor cannot himself spend the state surplus, he can spend the money in his discretionary fund, Governor's Office Grants, Gifts and Donations Fund. Reportedly, money from this fund was used for new lights for an outdoor theater production; paving a library parking lot; park and baseball field improvements; expansion of the kitchen and bathrooms at a sports complex; a race car sponsorship; and, a new baseball stadium.[4] Governor Justice admits that part of the money was used for "for long-sought improvements to the Marshall baseball stadium."*Renewed Motion* at p. 11.

Governor Justice relies upon a public hearing that was held regarding the CARES Act money and subsequent use of the money. *Renewed Motion* at pp. 6-7, n. 9-10. While Governor Justice summarizes the testimony, a critical fact should be noted. The money for which the State

---

[4] *See*, https://mountainstatespotlight.org/2024/02/19/wv-governor-civil-contingency-fund/ and https://wvpublic.org/senate-finance-investigates-governors-donation-to-marshall-for-new-baseball-stadium/ (accessed March 24, 2024).

reimbursed itself was money paid by the State out of the general revenue fund for expenditures made by the State to WVDOCR and WVDOHS for expenses purportedly connected to the coronavirus. See Bentley Senate Testimony 11:39:27 – 11:47:05. Therefore, instead of the money being returned to the general revenue fund from which the money was originally paid, the reimbursement went into the Governor's Office Grants, Gifts and Donations Funds, which could be used by the Governor as he deems appropriate. Government Justice did not deem it appropriate to use the money to alleviate unconstiutional conditions in jails and prisons—questions remain regarding why that was so.

Governor Justice, much like the former United States Secretary of Homeland Security, is attempting to avoid discovery despite presenting incongrous facts relevant to the Plaintiffs' claims. The California District Court reasoned that, in a related case, the court, in deciding a motion for summary judgment, concluded that an inconsistency existed between the stated purpose of the family separation policy to refer adult immigrants for prosecution, and the actual intent of the policy to use the separation as a deterrent to other immigrants. *In re A Subpoena to Testify*, 2024 U.S. Dist. LEXIS 43258, \*\* 17-18. The Disctrict Court concluded, "[t]hus, given the abundance of evidence produced, in this case and in related litigation, indicating that the actual intent of the Zero Tolerance Policy was to separate families to deter illegal immigration, the bad faith element is satisfied." *Id*. at \*18.

Governor Justice did not promulgate a policy that separated children from their parents, but Plaintiffs allege that he did have objective awareness of the conditions of the corretional faciliites, which, at times, led to the death of inmates, but he was deliberately indifferent to these unconstitutional conditions by determining not to spend funds on improving the conditions, but on

13

other items, such as baseball and racecars. Two separately declared States of Emergency declared by this Defendant demonstrates his awareness.

Moreover, Governor Justice's responses to discovery and the actions he took with respect to the correctional system are diametrically opposed. The discovery responses indicate that he is not involved in any way with the correctional system, while at the same time, declaring States of Emergency, issuing Executive Orders, seeking pay increases, and making statements that a "cover up" existed demonstrate that he is intimately familiar with the issues alleged in this action. Plaintiffs contend that Defendant Justice was deliberately indifferent to the unconstitutional conditions of Plaintiffs and the class members so that he could tout his success in creating budget surpluses. *See e.g. Complaint* (Document 9), at ¶ 84.

The attempt of Governor Justice to focus on selective allegations in the *Complaint* and to ignore other allegations to justify a protective order is unwarranted and results in a failure to support his request for a protective order. His actions in failing to utilize available resources while inmates died and lived in deplorable conditions is indicatie of bad faith or misconduct, as is his attempt to disclaim all knowledge and responsibility.

### b. The Governor's testimony is necessary.

Governor Justice contends that his testimony is not necessary to the case. First and foremost, the Governor is the individual responsible for proposing a budget that includes corrections, making spending decisions out of the Civil Contingent Fund; the Governor made such decisions; and the decisions did not address the unconstitutional conditions of overcrowding, understaffing, and deferred maintenance.

The cases cited by Governor Justice are inapplicable to the facts of the case *sub judice,* The California governor in the *Deukmejian* case was alleged to have unique knowledge of the prison

14

conditions based upon his former positions as a California attorney general and state legislator and statements to the effect he was glad the prisons were full; and, information that he opposed legislature regarding early release to alleviate overcrowding. *Deukmejian v. Superior Court*, 143 Cal. App. 3d 632, 634, 191 Cal. Rptr. 905 (1983)[5]. Those justifications are dissimilar to Plaintiffs' contentions that Governor Justice was informed of the conditions in prisons and was aware of the overcrowding, understaffing, and deferred maintenance, yet failed to utilize any of the options available to him to address these issues. Furthermore, Plaintiffs do not seek the deposition to understand the appropriateness of certain remedies. Plaintiffs seek the deposition to establish objective knowledge and deliberate indifference as required under the PLRA.

In the *Coleman* case, the three-judge panel was considering the propriety of a prison release order under the Prison Litigation Reform Act. *Coleman v. Schwarzenegger*, Nos. CIV S-90-0520 LKK JFM P,, C01-1351 TEH, 2008 U.S. Dist. LEXIS 70224, *18 (E.D. Cal. Sep. 15, 2008). The issues before the court were whether "overcrowding of California prisons is the primary cause of the violation of plaintiffs' constitutional rights and that no other relief will remedy the violation." *Id*. (citation omitted). Those are not the issues presently in the case *sub judice*.

In circumstances wherein a government official is involved in a decision-making process that is alleged to have resulted in a violation of constitutional rights, the testimony of that government official is necessary. *See e.g. Bagley v. Blagojevich*, No. 05-3156, 2007 U.S. Dist. LEXIS 45346 (C.D. Ill. June 22, 2007) (District Court denied Governor Blagojevich's second motion for reconsideration of the denial of his request for a protective order preventing him from being deposed.) Personal knowledge or direct involvement justifies a deposition of a high-ranking government official. *See e.g.*, *State ex rel. Summit Cty. Republican Party Exec. Comm. v. Brunner*,

---

[5] The Court also noted that it was at a slight disadvantage because "the parties did not fully describe the underlying lawsuit." *Id*. at 634. Therefore, the decision is based upon a lack of complete information.

2008-Ohio-1035, 117 Ohio St. 3d 1210, 883 N.E.2d 452 (A deposition of the Ohio Secretary of State was permitted).

Plaintiffs established that Governor Justice provided incongruous information at best regarding the correctional system and his actions. Only he has the knowledge to address these incongruities and his actions as well as the elements of objective knowledge and deliberate indifference. Thus, his testimony is necessary.

### c. Plaintiffs have shown that relevant information sought from the Governor cannot be obtained elsewhere.

Governor Justice again attempts to rewrite the allegations of the *Complaint*, or, at least embellish them. Governor Justice argues that Plaintiffs attached deposition transcripts that "demonstrate that corrections officials reported certain conditions to the Governor's Office" and "the Governor acted on these reports by issuing Executive Order No. 5-22 (to call for the National Guard to staff jails)." *Renewed Motion*, at p. 16. However, the deposition testimony demonstrates that the Governor's Office was informed many times over many years regarding the conditions at the jails and prisons, not just one time in 2022, when the Executive Order was issued. The information provided to the Governor's Office was ignored for an extended period of time resulting in continuing violations of the inmates' constitutional rights.

Moreover, Governor Justice has not provided the names of any witnesses that would be able to provide the information sought. *See e.g.*, *Scott v. Louisville-Jefferson Cty. Metro Gov't,* No. 3-20-CV-00535-BJB-CHL, 2023 U.S. Dist. LEXIS 142301, *14 (W.D. Ky. Aug. 14, 2023) ("Defendants have not shown that persons other than Mayor Greenberg can provide the information sought by Plaintiffs. They have made no offers of a substitute witness who can testify in the Mayor's place."). In the case *sub judice,* Governor Justice claims no such witnesses exist.

*See*, *Governor Justice's Rule 26(A)(1) Initial Disclosures*, Ex. C. The *Scott* Court permitted the deposition of the mayor to go forward. *Scott,* at *16.

Governor Justice further argues that Plaintiffs cannot inquire into why he took certain actions and did not take others. This contention is incorrect. Once "extraordinary circumstances" are established, "a government decision-maker" can "be compelled to testify about his mental processes in reaching a decision, 'including the manner and extent of his study of the record and his consultations with subordinates.'" *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209 (4th Cir. 1991) (*quoting*, *United States v. Morgan,* 313 U.S. 409, 421-422, 85 L. Ed. 1429, 61 S. Ct. 999 (1941) (further citations omitted). As Plaintiffs have established exceptional circumstances, they may inquire into Governor Justice's thought processes. Only the governor can provide this testimony.

### B. State sovereign immunity does not bar the deposition of the Governor.

Governor Justice reiterates his argument that sovereign immunity bars this Court from acting in any manner with respect to him. The arguments of Governor Justice reiterate the arguments he set forth in *Governor Justice's Memorandum of Law Supporting his Motion to Dismiss* (Document 16). Plaintiffs previously addressed these arguments regarding the applicability of sovereign immunity in the following documents: *Plaintiffs' Response in Opposition to Defendant Mark Sorsaia's Motion to Dismiss* (Document 17), at pp. 9-14; *Plaintiffs' Response in Opposition to Governor Justice's Combined Motion to Dismiss and to Transfer Division* (Document 18); and, *Plaintiffs' Response in Opposition to Defendants' Joint Motion to Stay Discovery Pending Resolution of Dispositive Motions* (Document 26). Plaintiffs fully incorporate the relevant portions of these documents as if restated herein.

By an *Order* (Document 27) entered on December 6, 2023, this Court denied *Defendants' Joint Motion to Stay Discovery Pending Resolution of Dispositive Motions* (Document 20) finding

that "no good cause for the requested stay, given the nature of the particular case." (Document 27, at p. 1).

Plaintiffs respectfully request that this Court conclude that Governor Justice is not entitled to a protective order on the basis of sovereign immunity given the nature of this particular case. Sovereign immunity provides broad protections for state officials as a general rule. Sovereign immunity is not applicable in the face of violations of the *Constitution of the United States* for which Plaintiffs seek prospective relief.

While immunity is provided for government officials, "[p]ublic officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices." *Scheuer v. Rhodes*, 416 U.S. 232, 241-42, 94 S. Ct. 1683, 1689 (1974).

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court **DENY** *Governor Justice's Renewed Motion for Protective Order* in its entirety and **GRANT** *Plaintiffs' Motion to Compel Defendant Justice to Respond Fully and Adequately to Discovery* as it relates to Request for Production of Documents Nos. 15 and 25, and **ORDER** that the depositions of Justice and Chief of Staff Brian Abraham take place in the near future.

          **PLAINTIFFS,**

          **By Counsel**

          */s/ Stephen P. New*
          Stephen P. New (WVSB No. 7756)
          Stephen New & Associates
          430 Harper Park Drive
          Beckley, West Virginia 25801
          Ph: (304) 250-6017
          Fax: (304) 250-6012
          steve@newtaylorlaw.com

>Timothy Lupardus (WVSB No. 6252)
>The Lupardus Law Office
>275 Bearhole Road
>Pineville, West Virginia 24874
>(304) 732-0250
>office@luparduslaw.com
>
>Zachary Whitten (WVSB No. 13709)
>The Whitten Law Office
>P.O. Box 753
>Pineville, West Virginia 24874
>zwhittenlaw@gmail.com
>
>Robert Dunlap (WVSB No. 10012)
>Robert Dunlap & Associates
>208 Main Street
>Beckley, West Virginia 25801
>(304) 255-4762
>robertdunlapesq@gmail.com

Case 5:23-cv-00530   Document 127   Filed 06/24/24   Page 20 of 20 PageID #: 2201

**IN THE UNITED STATES DISTRICT COURT  
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA  
BECKLEY DIVISION**

| | |
|---|---|
| **THOMAS SHEPPHEARD,** ) | |
| **TYLER RANDALL,** and ) | |
| **ADAM PERRY,** next friend ) | |
| and guardian of Minor child J.P., ) | |
| on their own behalf and on behalf ) | |
| of all others similarly situated, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil Action No. 5:23-cv-00530 |
| ) | (Judge Berger) |
| **JAMES C. JUSTICE JR.,** ) | |
| in his official capacity as Governor of ) | |
| the State of West Virginia, and ) | |
| **MARK SORSAIA,** in his official ) | |
| capacity as the Cabinet Secretary ) | |
| of the West Virginia Department ) | |
| of Homeland Security, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## CERTIFICATE OF SERVICE

Undersigned counsel for Plaintiffs does hereby certify that the foregoing *Plaintiffs' Response in Opposition to Governor Justice's Renewed Motion for Protective Order and Supplemental Response to Motion to Compel* was filed with the clerk on June 24, 2024 via the Court's CM-ECF Filing System which will provide electronic notification to all counsel of record.

*/s/ Stephen P. New*  
Stephen P. New (WVSB No. 7756)