IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTIRCT OF WEST VIRGINIA
BECKLEY DIVISION

THOMAS SHEPPHEARD, *et al.*,    )
                               )
        Plaintiffs,            )
                               )
v.                             )        Civil Action No. 5:23-cv-530
                               )        (Judge Berger)
JAMES C. JUSTICE, JR.,         )
in his official capacity as Governor of the  )
State of West Virginia; and    )
MARK SORSAIA, in his official capacity  )
as the Cabinet Secretary of the West  )
Virginia Department of Homeland  )
Security,                      )
                               )
        Defendants.            )

## MEMORANDUM SUPPORTING THE GOVERNOR'S MOTION FOR ATTORNEY'S FEES AND COSTS

Plaintiffs' now-dismissed claim against the Governor was legally groundless and unreasonable from the day it was filed. It challenged various prison conditions on a prospective basis and demanded, among other radical requests, that a federal court order the Governor to spend at least $330 million in unappropriated public funds from the state treasury on corrections. There was never a colorable legal basis for such a demand. More than that, clear and controlling federal caselaw—including from the U.S. Supreme Court—stood squarely against it.

Let us be clear. This was a political lawsuit in search of a legal theory that has never been adopted by any federal court—or even anything close to it. Had this case actually been about remedying particular conditions of confinement, which the complaint alleged in gritty detail, then Plaintiffs would have named the relevant prison wardens. *But they did not.* Instead, Plaintiffs aimed squarely at challenging the obviously discretionary policy decisions of the State's chief constitutional officer, which their request for relief and discovery requests—

including a highly premature attempt to interrogate the Governor—made regrettably clear. This Court was thus entirely correct to summarily dismiss it based on lack of constitutional standing.

The irony of Plaintiffs' baseless claim is that it required significant expenditure of *taxpayer funds* to defend against it. And because of Plaintiffs' unreasonable and groundless discovery requests, those fees mounted as the litigation continued. There was no insurance coverage, as Plaintiffs tactically sought only prospective relief—and no damages. And so, both the Governor and the Secretary's legal bills were paid for directly by the taxpayers, from general revenue funds previously appropriated by the Legislature to each office. The purpose of this motion is to recover the needless expenditure of those taxpayer funds from Plaintiffs and their counsel under 42 U.S.C § 1988, because the Governor was the "prevailing party" in this case.

For these reasons and those that follow, this Court should award the Governor's reasonable attorney's fees and costs from Plaintiffs and their counsel.

## BACKGROUND

On August 8, 2023, Plaintiffs Thomas Sheppheard, Tyler Randall, and Adam Perry (as next friend and guardian to minor child J.P.), on behalf of themselves and putative classes, filed a complaint alleging that West Virginia's correctional institutions are being operated in violation of the Eighth Amendment. Plaintiffs alleged a single count under 42 U.S.C. § 1983 for violation of the Eighth Amendment challenging the conditions of their confinement. Only declaratory and injunctive relief was sought—no damages. This meant that (1) the claim could only be viable if Plaintiffs satisfied the *Ex parte Young* exception to state sovereign immunity, and (2) that the State's liability insurance coverage was not triggered such that the Governor (and Sorsaia) would be required to pay for all litigation fees and expenses *directly from taxpayer funds*.

2

Strangely, the complaint named only two defendants—James C. Justice, Jr., Governor, and Mark Sorsaia, Secretary of the Department Homeland Security, in their official capacities only. Plaintiffs strategically did not name a single warden or other official with direct responsibility over the conditions of confinement in state correctional facilities, as is typical (and appropriate) in a conditions-of-confinement case. The complaint contains extensive factual allegations concerning the state of the conditions in the correctional facilities, including objective awareness of them by public officials in both the state executive and legislative branches, as well as the steps that these officials, including the Governor, have undertaken to try to address and improve them. In their single cause of action against both defendants, Plaintiffs attempted to allege that the Defendants were objectively aware of unconstitutional conditions at state correctional facilities and remained subjectively deliberately indifferent to them, thus amounting to a violation of the Eighth Amendment.

For that purported violation, Plaintiffs sought relief that was as extraordinary as it was obviously barred by well-established law. In addition to class treatment and a declaratory judgment, Plaintiffs demanded that this Court "compel" the Governor to [1] "spend state budget surplus funds (or submit bills, call for special session, etc.) in order to make all of the necessary deferred maintenance repairs required at all West Virginia correctional facilities in an amount not less than *270 million dollars*;" and [2] to further "spend state budget surplus funds to hire and pay the requisite number of correctional staff needed to appropriately staff the facilities, not less than *60 million dollars*[.]" ECF No. 1, at *26 (emphases added). In sum, Plaintiffs demanded that the alleged Eighth Amendment violations require the Court to issue a judicial decree to the Governor to "spend state budget surplus funds" in the total amount of *no less than $330 million.*

3

The Governor promptly filed a motion to dismiss, raising numerous, well-settled legal bars to Plaintiff's claim and demands—any one of which would be independently sufficient to justify summary dismissal. *See* ECF Nos. 15–16. These grounds included, at the start, those based on Plaintiffs' failure to even establish *subject matter jurisdiction* based on controlling, and clearly applicable, U.S. Supreme Court and Fourth Circuit precedent. *See* ECF No. 16, at 5–11 (failure to establish *Ex parte Young* exception to state sovereign immunity); *id.*, at 12–14 (failure to establish two out of the three elements of Article-III standing). Not only that, but Plaintiffs' complaint as written pleaded themselves out of court on Rule 12(b)(6) review, *see id.*, at 14–18 (Plaintiffs affirmatively pleaded the Governor's subjective awareness of and efforts to correct the prison conditions, rather than his subjective indifference to them, as required to bring their claim).

This Court summarily dismissed Plaintiffs' claim against the Governor (and the Secretary) based on the straightforward application of longstanding principles of Article III standing, which "implicates a federal court's subject matter jurisdiction," *PEM Entities LLC v. Cnty. of Franklin*, 57 F.4th 178, 182 (4th Cir. 2023). *See* ECF No. 135. In just ten pages, the Court disposed of the entire case against both defendants based on Plaintiffs' failure to even plead the elements of traceability or redressability. *See id.* at 6–15. In its analysis, the Court relied upon longstanding binding precedent, including cases brought to Plaintiffs' attention in the motion to dismiss briefing. *See id.* at 6–7 (relying on, among others, *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) and *Ex parte Young*, 209 U.S. 123, 158 (1908)). In short, Plaintiffs' claims for relief against the Governor (and the Secretary) were dead on arrival because they never satisfied the most fundamental requirement to necessary to enter federal court. This Court thereafter entered final judgment. *See* ECF No. 136.

4

**ARGUMENT**

Congress specifically allows the award of "a reasonable attorney's fee" to "the prevailing party" in various kinds of civil rights cases, including suits brought under 42 U.S.C. § 1983—like this one. *See* 42 U.S.C. § 1988. Just as one of the purposes of § 1988 is to ensure that a prevailing plaintiff is compensated for "vindicating a policy that Congress considered of the highest priority," *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968), it is also designed to ensure that plaintiffs and their counsel are properly incentivized *not* to bring cases that are groundless. The U.S. Supreme Court has thus reiterated that "[i]n enacting § 1988, . . . Congress sought 'to protect defendants from burdensome litigation having no legal or factual basis." *Fox v. Vice*, 563 U.S. 826, 833 (2011) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420 (1978)). "Accordingly, § 1988 authorizes a district court to award attorney's fees to a defendant 'upon a finding that the plaintiff's action was frivolous, unreasonable, *or* without foundation.'" *Id.* at 833 (quoting *Christiansburg*, 434 U.S. at 421) (emphasis added). Here, the Governor can readily show that Plaintiff's action was "frivolous, unreasonable, *or* without foundation." The Governor's office is therefore entitled to its reasonable attorney's fees and costs.

I.    **The taxpayers are entitled to reimbursement of the attorney's fees and costs they paid to defend the Governor because Plaintiffs' claim was unreasonable and groundless on its face.**

Plaintiffs' Eighth Amendment claim against the Governor, challenging the conditions of their confinement in several of the state correctional institutions, was legally unreasonable and groundless from the day it was filed. As Plaintiffs' own pleadings suggest, this lawsuit was never meant to succeed because Plaintiffs were—on the face of the complaint—complaining of conduct that *did not cause*, and suing individuals who *cannot cure*, their alleged injuries. The gravamen of Plaintiffs' argument is that the West Virginia corrections system is insufficiently

funded and that lack of funding is causing generally unconstitutional conditions of confinement in all prisons, jails, and juvenile centers. Plaintiffs alleged that they had specifically experienced mold exposure, exposure to rodents and rodent feces, inadequate food, showers with water too hot, and limited access to hygiene products, recreational time, and to the law library. Yet instead of suing those actually responsible for funding decisions, or the official with the actual authority to make the specific rules and policies to alleviate those complaints, Plaintiffs tactically chose to sue the Governor.

It has been a "long-standing rule" in our jurisprudence "that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute." *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (quoting *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001)). And the Fourth Circuit has repeatedly made clear, "the mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action" challenging the constitutionality of a state policy. *Id.* (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001)). Instead, he "must have a specific duty to enforce the law" at issue. *Id.*

It is further axiomatic that Article III standing requires a showing of (1) injury, (2) traceability, and (3) redressability. Traceability requires there to be a "causal connection" between Plaintiffs' injury and the complained-of conduct—and not the "independent action of some third party not before the court." *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Similarly, redressability requires a showing that "it is likely, as opposed to merely speculative" that a favorable decision will cure the complained-of injury. *Doe v. Virginia Dept. of State*, 713 F.3d 745, 755 (4th Cir. 2013). But when the action of a third party is necessary to provide relief, such relief is merely speculative. *Id.* In other words, if the defendant

6

"has no role in enforcing the law at issue," then neither traceability nor redressability can be established. *Disability Rights*, 24 F.4th at 902; 903.

Plaintiffs, *by their own pleadings*, concede that the Governor has neither the power to appropriate funds nor does he have any role in determining the operating policies of West Virginia's correctional facilities. Both those jobs are done by third parties not before the court. As to funding, the Governor only has the power to *propose* a budget, which is subject to the legislature's approval. W. Va. Const. art. VI, § 51(B)(5) (the Legislature "may amend" the Governor's proposed budget bill "by increasing or decreasing any item therein.") Or, as the complaint puts it: "Governor Justice is responsible for submitting a *proposed budget* for each fiscal year *to the legislature for consideration*." ECF No. 1 at ¶ 11 (citing W. Va. Const. art. VI, § 51) (emphasis added). And upon receiving the Governor's proposed budget, "*the Legislature of West Virginia* is empowered to appropriate the funds." *Id.* at ¶12 (citing W. Va. Const. art. X, § 3) (emphasis added). Then, "[a]fter the budget bill has been finally acted upon *by both houses*, supplemental bills may be *considered and passed*." *Id.* at ¶13 (citing W. Va. Const. art. VI, § 51) (emphasis added).

In other words—as pled in the complaint—the fact that the department of corrections received purportedly inadequate funding stems not from the Governor himself, but from the "independent actions" of the legislature, which is a "third party not before the court." *Disability*, 24 F.4th at 901. Frankly, Plaintiffs did not even attempt to allege the traceability required to establish Article III standing.

Similarly, Plaintiffs provide no authority which might grant the Governor the ability to directly remedy the alleged violations in the Complaint. *See Ex parte Young*, 23 U.S. 123, 158 (1908) (permitting injunctions against state officials to require them *only* to perform ministerial,

non-discretionary duties—not to use their discretion). Indeed, even if the Court had issued a decision favorable to Plaintiffs here, such a decision would have required the action of a third party to redress their alleged injuries. Specifically, the Commissioner of the West Virginia Division of Corrections and Rehabilitation ("DCR")—to whom the legislature has granted the authority to establish policies governing institutions within the DCR and supervising the treatment of inmates—would need to act. W. Va. Code 15A-3-4(a)(1). And Plaintiffs seem to recognize that DCR holds this power. ECF No. 1 at ¶ 19 (referring to duties vested in DCR, not the Governor). Yet Plaintiffs chose to name the Governor as defendant—contrary to well established law—relying solely on his general supervisory authority and his discretionary ability to issue pardons and executive orders.[1]

Because Plaintiffs sought no monetary relief, this lawsuit was not covered through BRIM, the State's insurance. Instead, all legal fees were borne directly by the taxpayers.[2] After the parties served their initial disclosures, Plaintiffs immediately noticed the deposition of the Governor—prior to any written discovery, and prior to taking (or noticing) the depositions of Secretary Sorsaia or any DCR employee who could have actual knowledge of the conditions of confinement within certain facilities. ECF No. 36. Underscoring the political nature of this lawsuit, Plaintiffs' counsel told the undersigned during a meet and confer call that he intended to—contrary to clear and longstanding precedent—question the Governor about his discretionary decision making process, including his reasons for making certain funding proposals, his

---

[1] To be sure, Plaintiffs' counsel, who is well-versed in § 1983 prison litigation, knows which defendants to name in lawsuits regarding conditions of confinement in correctional facilities. *See e.g., Rose v. Sandy*, No. 5:22-cv-405 (S.D.W. Va.) (regarding conditions of confinement at the Southern Regional Jail, naming, inter alia, DCR Commissioner and facility superintendent).

[2] *See* BRIM State Liability Policy, available at https://brim.wv.gov/policies/Documents/2023%20Policies/2022%20State%20Agencies%20GL%206882275.pdf (providing coverage, including legal defense, only for bodily injury and property damage resulting from certain occurrences).

explanation for not calling special sessions, and his internal discussions with his department

heads and staff. The Governor was forced to file a motion for protective order to defend the

executive privilege. ECF No. 47.[3] The next day, Judge Aboulhosn cancelled the Governor's

deposition pending full briefing of the issue. Plaintiffs' counsel confirmed the inflammatory and

political nature of his desired deposition, stating that he intended to ask the Governor about all

sorts of irrelevant, political questions, including why the office spent discretionary funds on

"baseball and racecars." ECF No. 49.

Weeks after noticing the Governor's deposition, Plaintiffs propounded extensive,

identical and unreasonable discovery requests on the Governor and Secretary Sorsaia.[4] Contained

therein were 131 requests for admission, each of was improper. *See* ECF No. 130 at 21

(explaining that because half the requests for admission sought legal conclusions, and half were

"so broadly worded, without reference to any specific event, that they were facially

inappropriate" the Governor's qualified denials and objections thereto would not be deemed

admitted). As for the requests for production, which were almost entirely cumulative of the

requests sent to Secretary Sorsaia, the Governor objected to the majority, but responded to the

requests that did not seek duplicative documents. That is, the Governor produced non-privileged,

responsive communications with his office. Despite the Governor's good-faith effort to respond,

Plaintiffs nonetheless moved to compel the Governor to produce all requested documents—

including duplicates of those produced by Sorsaia.[5] Again, Magistrate Judge Eifert denied

---

[3] This Motion for Protective Order was subsequently re-briefed, along with other pending discovery issues, for the benefit of Judge Eifert, who was transferred the case from Judge Aboulhosn.

[4] The Governor's proposed depositions was noticed to take place *before* Plaintiffs' counsel would receive or have the benefit of written discovery responses or documents produced in discovery.

[5] To date, Secretary Sorsaia has produced over 17,000 pages of responsive documents. Secretary Sorsaia had not yet produced responsive emails and communications because of the sheer size of the responsive documents (over 100,000 documents). Plaintiffs sought the *same documents* from the Governor, which—to save costs—the

Plaintiffs' motion concluding that it is unreasonable for both state officials "to answer the same discovery requests or provide the same documents, as that is duplicative discovery; particularly in a class action seeking only declaratory and prospective relief." *Id.* at 13.

In all, Plaintiffs (1) filed a complaint so devoid of any attempt to establish standing that it can only be seen as a political vehicle, (2) sought to depose the Governor about the patently improper subject of his discretionary, internal deliberative policymaking process, (3) propounded more than 200 discovery requests that were improper *on their face*—forcing the Governor to contest them, and (4) despite the Governor's good-faith attempts to respond to discovery forced him to litigate his responses to "facially inappropriate" requests for admission and wholly duplicative requests for production.

Plaintiffs' initial filing of this doomed-to-fail lawsuit admittedly suing improper parties and seeking remedy that can never be ordered by a federal court was so unreasonable as to itself warrant attorney's fees. But Plaintiffs' aggressive pursuit of facially inappropriate discovery requests and a politically-motivated deposition of the Governor forced the Governor's office to expend far more taxpayer funds on this unreasonable lawsuit. It is hard to find behavior that could more readily render a plaintiff responsible for a defendant's attorney's fees under 42 U.S.C. § 1988.

## II.    The Governor's attorney's fees and costs are reasonable.

When assessing the reasonableness of attorney's fees, courts are guided by the following factors, which are generally known as the *Johnson* factors: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the

---

Governor objected to producing. In responding to the only portion of the discovery requests that were *potentially* not duplicative (communications to or from Governor@wv.gov and Brian.r.Abraham@wv.gov), the Governor located and produced only 295 responsive, nonprivileged documents.

legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). The Supreme Court has instructed that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In total, the Governor seeks to recuperate approximately $165,000 spent defending against this facially unreasonable and groundless lawsuit.

### A. Hourly Rate

"In determining the hourly rate, four factors are particularly relevant: the customary fee for like work; the experience, reputation and ability of the attorneys; attorneys' fees awards in similar cases; and the amount in controversy and the results obtained." *Cobranchi v. City of Parkersburg*, No. 2:18-CV-01198, 2022 WL 5250297, at *3 (S.D.W. Va. Oct. 6, 2022) (cleaned up). Fees awarded pursuant to § 1988 "are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). In that vein, the Governor requests the following hourly rates: $425 for Michael Hissam, partner and lead counsel on the case; $375 for all other partners; $310 for associates; and $150 for paralegals.

These rates are reasonable for at least four reasons. *First*, the Governor's office agreed to and paid the requested hourly rates. *See Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1337 (11th Cir. 2001) ("An agreed-upon rate is relevant evidence to determine the fee

11

rate, but it is not necessarily determinative."); *Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc.*, 246 F.3d 142, 151 ("The actual billing arrangement certainly provides a strong indication of what private parties believe is the 'reasonable' fee to be awarded."). That the Governor agreed to and actually paid the requested rates is persuasive evidence that the requested rates are indeed reasonable and consistent with the prevailing market rates for similar work by attorneys with similar experience and expertise in the relevant market.

*Second*, in an effort to conserve the taxpayer funds, Mr. Hissam provided the Governor with rates discounted well-below the market rate. The rates requested are therefore less than the rates his firm charges other hourly paying clients for similar work. *See People Who Care v. Rockford Bd. of Educ., Sch. Dist.* 90 F.3d 1307, 1310-11 (7th Cir. 1996) ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."). Indeed, Mr. Hissam and his partners presently charge other clients up to $700 for similar hourly work. That the requested rates are significantly less than rates charged to other clients for like work suggests that the requested rates are indeed reasonable.

*Third*, this award falls squarely within the range of hourly rates recently approved by this Court. *See Active Res., Inc. v. Hagewood*, 2022 WL 10177688, at *4 (S.D.W. Va. Oct. 17, 2022) (approving rates of $495 for partners and rates of $350 and $310 for associates) (Berger, J.); *Harman v. Webb*, 2023 WL 2755307, at *5 (S.D.W. Va. Mar. 31, 2023) (Goodwin, J.) (approving rates of $500 for partners, $300-$200 for associates, and $150 for paralegals); *Cnty. Comm'n of Fayette Cnty., v. Gadsden, Gaillard, & West, LLC*, 2023 WL 416198, at *4 (S.D.W. Va. Jan. 25, 2023) (Berger, J.) (approving rate of $500 for experienced counsel); *In re Emerald Grande, LLC*, 2021 WL 4692591, at *3 (Bankr. N.D.W. Va. July 28, 2021) (approving partner rate of $400 and associate rate of $300); *Johnson v. Ford Motor Co.*, 2018 WL 1440833, at *7

12

(S.D.W. Va. Mar. 22, 2018) (approving partner rates of $475-500); *Greenbrier Hotel Corp. v. Unite Here Health*, 2017 WL 2058222, at \*2–4 (S.D.W. Va. May 12, 2017) (awarding between $275–$550 for partners and $150–$400 for associates and senior attorneys); *Active Res., Inc. v. Hagewood*, 2022 WL 10177688, at \*5 (S.D.W. Va. Oct. 17, 2022) (Berger, J.) (awarding rates of $495/hour for experienced counsel to $310/hour for less experienced counsel for complex removal case).

*Fourth*, the Fitzpatrick Matrix, which was developed by the U.S. Department of Justice as a guideline for reasonable attorney fees in fee-shifting cases, established guideline attorney rates for 2019-2023.[6] All rates requested herein fall well below the 2023 rates provided in the matrix—which is additional evidence of their reasonableness. For example, according to this matrix, attorneys with 15 years of experience, like Mr. Hissam and Mr. Ritchie should receive an hourly rate of $687. Attorneys with 3-years of experience, like Ms. Gleason, should receive an hourly rate of $520. The rates requested by the Governor are more than reasonable and appropriate.

## B. Hours Reasonably Expended

A fee petitioner must document "the appropriate hours expended." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Even so, the Supreme Court has observed that "trial courts need not, and indeed should not, become green-eyeshade accountants," and should remain mindful that the goal of shifting fees is to achieve "rough justice, not auditing perfection." *Fox v. Vice*, 563 U.S. 826, 828 (2011). Nonetheless, when applying for fees, the petitioner "should exercise billing judgment." *Cobranchi*, 2022 WL 5250297 at \*6.

---

[6] https://www.justice.gov/usao-dc/page/file/1504361/dl

The Governor's counsel spent approximately 500 hours moving to dismiss, responding to discovery, and conducting discovery.[7] Without dispute, the Governor enjoyed unqualified success in his defense of this lawsuit, including in the discovery process. Not only was the complaint dismissed entirely, but he was successful in defending Plaintiffs' motions to compel, and in defending Plaintiffs' attempts to improperly depose the Governor. Plaintiffs deliberately chose to aggressively pursue discovery against the Governor—despite the fact that *on the face of the complaint* they had no standing to sue him. Such tactics by Plaintiffs needlessly increased the cost of litigation for the Governor, thereby requiring him to seek his appropriate attorneys' fees.

## CONCLUSION

For the foregoing reasons, the Governor's motion for attorney's fees and costs should be granted.

<div style="margin-left: 40%;">

**James C. Justice, II, Governor,**
**By Counsel:**

/s/ Michael B. Hissam
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
Maureen F. Gleason (WVSB #14452)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
zritchie@hfdrlaw.com
mgleason@hfdrlaw.com

*Counsel for James C. Justice, II, Governor, in his official capacity*

</div>

---

[7] This fee petition seeks recovery for only approximately 480 of those hours.

14